IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 6:22-CR- 3 |
| v. | § | JUDGE Kernodle |
| | § | |
| SUSAN L. HERTZBERG (01) | § | **UNDER SEAL** |
| MATTHEW JOHN THEILER (02) | § | |
| DAVID WELDON KRAUS (03) | § | |
| JEFFREY PAUL PARNELL (04) | § | |
| THOMAS GRAY HARDAWAY (05) | § | |
| LAURA SPAIN HOWARD (06) | § | |
| JEFFREY PAUL MADISON (07) | § | |
| TODD DEAN COOK (08) | § | |
| WILLIAM TODD HICKMAN (09) | § | |
| CHRISTOPHER ROLAND | § | |
| GONZALES (10) | § | |
| RUBEN DANIEL MARIONI (11) | § | |
| JORDAN JOSEPH PERKINS (12) | § | |
| ELIZABETH RUTH SEYMOUR (13) | § | |
| LINH BA NGUYEN (14) | § | |
| THUY NGOC NGUYEN (15) | § | |
| JOSEPH GIL BOLIN (16) | § | |
| HERIBERTO SALINAS (17) | § | |
| HONG DAVIS (18) | § | |

**FILED**

JAN 1 3 2021

Clerk, U.S. District Court
Texas Eastern

## INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

### General Allegations

At all times relevant to this Indictment:

### Federal Health Care Programs

1.      The Medicare Program ("Medicare") is a federal health care program

providing benefits to persons who are over the age of sixty-five and some persons under

the age of sixty-five who are blind or disabled.  Medicare is administered by the Centers

for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services (HHS).  Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

2.     Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it is a public plan affecting commerce under which medical benefits, items, and services are provided to individuals and under which individuals and entities who provide medical benefits, items, or services may obtain payments.

3.     Medicare is a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f), in that it is a plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government.

4.     The Texas Medical Assistance Program (Medicaid) is a health care benefit program jointly funded by the State of Texas and CMS.  The Medicaid program helps pay for reasonable and necessary medical procedures and services provided to individuals who are deemed eligible under state low-income programs.  The Texas Health and Human Services Commission (HHSC) is responsible for administering the Medicaid program in the State of Texas.  HHSC contracts with the Texas Medicaid and Healthcare Partnership (TMHP) to receive applications from prospective Medicaid providers, assign Medicaid provider numbers, educate providers as to Medicaid policies and regulations, and process and pay Medicaid claims.  Individuals eligible under the Medicaid program are referred to as Medicaid recipients.

5.      Medicaid is a "health care benefit program," as defined by 18 U.S.C. § 24(b), in that it is a public plan affecting commerce under which medical benefits, items, and services are provided to individuals and under which individuals and entities who provide medical benefits, items, or services may obtain payments.

6.      Medicaid is a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), in that it is a plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government.

7.      TRICARE is a health care program of the United States Department of Defense Military Health System.  TRICARE provides civilian health benefits for uniformed service members, retirees, their families, and survivors.  Beneficiaries include all seven branches of the Uniformed Services (Army, Air Force, Navy, Marine Corps, National Oceanic Atmospheric Administration, Coast Guard, and the commissioned corps of the Public Health Service).   The TRICARE program is managed by the Defense Health Agency (DHA).  Individuals who receive health care benefits under TRICARE are referred to as TRICARE beneficiaries.

8.      TRICARE is a "health care benefit program," as defined by 18 U.S.C. § 24(b), in that it is a public plan affecting commerce under which medical benefits, items, and services are provided to individuals and under which individuals and entities who provide medical benefits, items, or services may obtain payments.

9.      TRICARE is a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f), in that it is a plan or program that provides health benefits, whether directly,

through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government.

### Clinical Laboratories and Federal Health Care Programs

10.     CMS regulates all laboratory testing through the Clinical Laboratory Improvement Amendments (CLIA) regulations, which establish standards for laboratory testing covered and paid for by Medicare.  To register for Medicare and to obtain a certificate of accreditation, the owner of the laboratory must submit an application to HHS.  42 C.F.R. § 493.55.  The application must identify the laboratory and provide details about the laboratory's operations.  42 C.F.R. § 493.55(c).  Under no circumstances may a person solicit or accept materials from the human body for laboratory examination or other procedure unless there is in effect for the laboratory a certificate issued by HHS allowing those procedures to take place.  42 U.S.C. § 263a(b).

11.     The CLIA regulations define "laboratory" as a "facility for the biological, microbiological, serological, chemical, immunohematological, hematological, biophysical, cytological, pathological, or other examination of materials derived from the human body for the purpose of providing information for the diagnosis, prevention, or treatment of any disease or impairment of, or the assessment of the health of, human beings." 42 C.F.R. § 493.2.  Each laboratory must have appropriate and sufficient equipment, instruments, and supplies for the type and volume of testing that it performs. 42 C.F.R. § 493.1101(b).

12.     After laboratories have received CLIA accreditation, they may apply to Medicare to be a health care provider to receive payment for health care services

provided.  In submitting applications to Medicare, health care providers certify they understand and will abide by the federal laws and regulations governing their participation in Medicare, including a specific understanding of 42 U.S.C. § 1320a-7b(b), also known as the Anti-Kickback Statute.

13.     When Medicare approves a provider's application, Medicare issues the provider a unique provider number, known as a National Provider Identifier (NPI). Medicare uses the NPI to identify the provider in claims submitted for payment.  CMS contracts with Novitas to perform all enrollment activities for laboratories in the State of Texas.  CMS has contracted with Palmetto GBA (a subsidiary of Blue Cross Blue Shield of South Carolina) to handle such activities for laboratories in the State of Virginia.

14.     Upon enrollment, Medicare issues providers a provider manual that describes the requirements to participate in the Medicare program, as well as ongoing newsletters advising them of the additional requirements for participation and instructions on what services Medicare covers.  Medicare manuals and other resources are also publicly available online.

15.     CMS also contracts with Novitas to administer Medicare Part B claim payments in Texas, which includes claims for laboratory services.  Each time that a laboratory provider submits a claim to Medicare, the laboratory provider certifies that the claim is true, correct, and complete, and complies with all Medicare laws and regulations. The claims are generally submitted electronically.

16.     Medicare Part B covers medically necessary clinical diagnostic laboratory services that are ordered by physicians or practitioners.  Laboratory testing includes

Indictment – Page 5

certain blood tests, urinalysis, tests on tissue specimens, and some preventative screening tests (*e.g.*, cardiovascular and diabetes screening blood tests).  The tests must be provided by a laboratory that meets Medicare requirements.

17.     Medicare allows separate charges made by laboratories for drawing or collecting specimens regardless of whether the specimens are referred to hospitals or independent laboratories.  The laboratory is not permitted to bill for routine handling charges where a specimen is referred by one laboratory to another.

18.     A laboratory provider enrolled as a Medicare provider is able to file claims with Medicare to obtain payment for services provided to beneficiaries.  A Medicare claim is required to set forth, among other things, (a) the beneficiary's name and Medicare HICN, (b) the services performed for the beneficiary, (c) the date the services were provided, (d) the cost of the services, and (e) the name and identification number of the physician or other health care provider who ordered the services.

19.     Provider enrollment in the Medicaid program is also voluntary.  Similar to the Medicare program, a provider must be an approved Medicaid provider.  Each provider agrees to abide by the policies and procedures of the Medicaid program.

20.     The Medicaid program may pay a portion of a claim originally submitted to Medicare in the event that the beneficiary/recipient has both Medicare and Medicaid coverage.  This portion is generally 20% of the Medicare allowance for the billed charge.  An individual who is eligible under both the Medicare and Medicaid programs is referred to as a "dual-eligible beneficiary."  A claim originally submitted to Medicare and subsequently to Medicaid for payment is referred to as a "crossover claim."  Such claims

are sent to Medicaid after processing by Medicare.  Medicaid will pay its portion if Medicare originally allowed the claim.

21.     To become an authorized provider under the TRICARE program, a laboratory must be approved and certified under Medicare.  Then, the laboratory services may be cost-shared between Medicare and TRICARE.

### Critical Access Hospitals and Federal Health Care Programs

22.     To ensure that Medicare beneficiaries in rural communities can access necessary hospital care, Congress authorized favorable Medicare reimbursements for hospitals certified by CMS as critical access hospitals (CAHs).  Balanced Budget Act of 1997, P.L. No. 105-33 § 4201.

23.     To be certified as a CAH, hospitals participating in Medicare must meet certain requirements.  Among other things, CAHs must have 25 or fewer inpatient beds, must provide emergency services 24 hours per day, and generally are located in underserved rural areas some distance from other hospitals or CAHs.  42 C.F.R. §§ 485.610, 485.618, 485.620.

24.     A hospital certified as a CAH is eligible to receive favorable Medicare reimbursements, generally being paid 101 percent of reasonable costs for most inpatient and outpatient services provided to Medicare beneficiaries.  42 U.S.C. § 1395m(g).  The cost-based payments that CAHs receive for inpatient and outpatient services generally are much higher than the predetermined rates that Medicare pays acute care hospitals (non-CAHs) and laboratories for such services.

25.     Because Medicare's favorable reimbursement to CAHs is meant to ensure access to care by those in rural communities, a CAH is not eligible for cost-based reimbursement for services provided to individuals who are neither inpatients nor outpatients of the CAH.  *See* 42 C.F.R. § 413.70 (2015).

26.     As relevant here, for outpatient clinical diagnostic laboratory services, Medicare will pay 101 percent of reasonable costs to a CAH "only if [1] the individual is an outpatient of the CAH" and [2] either "[t]he individual is receiving outpatient services in the CAH on the same day the specimen is collected" or "[t]he specimen is collected by an employee of the CAH." 42 C.F.R. § 413.70(b)(7)(iv) (2015).  Although an individual Medicare beneficiary need not be "physically present in the CAH at the time the specimen is collected," the individual must be "an outpatient of the CAH." *Id.*

27.     The CAH can bill for outpatient services only if the individual beneficiary [1] "has not been admitted as an inpatient," [2] "is registered on the hospital or CAH records as an outpatient and [3] receives services (rather than supplies alone) directly from the hospital or CAH." 42 C.F.R. § 410.2.

28.     If a Medicare beneficiary is neither an inpatient nor an outpatient of the CAH, then reimbursement for the nonpatient's clinical diagnostic laboratory tests is based on the Medicare clinical laboratory fee schedule (CLFS).  42 C.F.R. § 413.70(b)(7)(vi) (2015).

**Special Fraud Alerts**

29.     To alert the public to "trends of health care fraud and certain practices of an industry-wide character," OIG issues special fraud alerts, which are published online and in the Federal Register.  59 Fed. Reg. 65,372, 65,373 (Dec. 19, 1994).  The fraud alerts "provide general guidance to the health care industry" and assist others "in identifying health care fraud schemes."  *Id.*

30.     In 1989, HHS Office of Inspector General (OIG) issued a Special Fraud Alert on Joint Venture Arrangements.  OIG warned that physician joint venture arrangements may violate the AKS where the arrangement was "intended not so much to raise investment capital legitimately to start a business, but to lock up a stream of referrals from the physician investors and to compensate them indirectly for those referrals."  OIG, Special Fraud Alert: Joint Venture Arrangements, *reprinted in* 59 Fed. Reg. 65,372, 65,374 (Dec. 19, 1994).

31.     In October 1994, the OIG issued a Special Fraud Alert on Arrangements for the Provision of Clinical Laboratory Services, *reprinted in* 59 Fed. Reg. 65,372, 65,377 (Dec. 19, 1994).  OIG warned about a variety of "inducements offered by clinical laboratories which may implicate the [AKS]," including the provision of items, services, and financial benefits.  *Id.*  OIG warned that "[w]hen one purpose of these arrangements is to induce the referral of program-reimbursed laboratory testing, both the clinical laboratory and the health care provider may be liable under the [AKS] and may be subject to criminal prosecution and exclusion from participation in the Medicare and Medicaid programs."  *Id.* at 65,377–78.  In the Special Fraud Alert, the OIG posed the

question, "How does the Anti-Kickback Statute relate to arrangements for the provision of clinical lab services?"  The OIG's answer, in part, was the following:

> Whenever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business.  The same is true whenever a referral source solicits or receives anything of value from the laboratory.  By 'fair market value' we mean value for general commercial purposes.  However, 'fair market value' must reflect an arm's length transaction which has not been adjusted to include the additional value which one or both of the parties has attributed to the referral of business between them.

*Id.* at 65,377.

32.     On June 25, 2014, the OIG issued a Special Fraud Alert on Laboratory Payments to Referring Physicians, *reprinted in* 79 Fed. Reg. 40,114 (July 11, 2014).  OIG noted that "[a]rrangements between referring physicians and laboratories historically have been subject to abuse and were the topic of one of the OIG's earliest Special Fraud Alerts."  *Id.* at 40,116 (citing 1994 Special Fraud Alert).  In the Special Fraud Alert, the OIG highlighted its concerns with arrangements in which the amounts paid to a referral source take into account the volume or value of business generated by the referral source, as follows:

> Arrangements in which laboratories provide free or below-market goods or services to physicians or make payments to physicians that are not commercially reasonable in the absence of Federal health care program referrals potentially raise four major concerns typically associated with kickbacks—corruption of medical judgment, overutilization, increased costs to the Federal health care programs and beneficiaries, and unfair competition.  This is because such transfers of value may induce physicians to order tests from a laboratory that provides them with remuneration, rather than the laboratory that provides the best, most clinically appropriate service.  Such transfers of value also may induce physicians to order more laboratory tests than are medically necessary, particularly when the

transfers of value are tied to, or take into account, the volume or value of business generated by the physician.  We are particularly concerned about these types of arrangements because the choice of laboratory, as well as the decision to order laboratory tests, typically is made or strongly influenced by the physician, with little or no input from patients.

*Id.*

### The Defendants and Associated Companies

33.     Boston Heart Diagnostics, Inc. (BHD), is a Delaware corporation.  Formed in 2007, the company is currently active and is a subsidiary of Eurofins Scientific, a global network of laboratories headquartered in Luxembourg.  BHD was headquartered in Framingham, Massachusetts and specialized in blood testing.  **Susan L. Hertzberg** was a principal and served as the Chief Executive Officer.  **Matthew John Theiler** was the Senior Vice President of Sales.  **David Weldon Kraus** was a Regional Sales Director. **Jeffrey Paul Parnell**, **Thomas Gray Hardaway**, and **Laura Spain Howard** were Area Managers.

34.     **Susan L. Hertzberg** resided in or around New York, New York and Scarsdale, New York.  As BHD's Chief Executive Officer, **Hertzberg** oversaw BHD's business in Texas, including its relationship with Little River Healthcare (Little River or LRH).

35.     **Matthew John Theiler** resided in or around Mars, Pennsylvania.  As BHD's VP of Sales, **Theiler** supervised BHD employees' sales activities in Texas.

36.     **David Weldon Kraus** resided in or around Loudon, Tennessee.

37.     **Jeffrey Paul Parnell** resided in or around Dallas, Texas.

38.     **Thomas Gray Hardaway** resided in or around San Antonio, Texas.

39.     **Laura Spain Howard** resided in or around McKinney, Texas.  In addition to acting as a BHD Area Sales Manager, she also was a recruiter for Management Services Organizations (MSOs) that paid kickbacks to providers in Texas.

40.     Rockdale Blackhawk, LLC, doing business as (dba) Little River Healthcare (Little River or LRH), was a Texas limited liability company.  Formed in 2006, the company is currently inactive.  Little River was a rural CAH.  **Jeffrey Paul Madison** was a principal and functioned as the Chief Executive Officer.  **Todd Dean Cook** was the Director of Laboratory Services and Chief Administrative Officer, among other roles.

41.     **Jeffrey Paul Madison** resided in or around Georgetown, Texas.

42.     **Todd Dean Cook** resided in or around Austin, Texas.

43.     Jones County Regional Healthcare System was a nonprofit Texas company. Formed in 2012, the company began doing business as Stamford Memorial Hospital on December 31, 2012 and is currently inactive.  Stamford was a rural CAH.  Unindicted Co-conspirator 1 was a principal and served as the Chief Executive Officer.

44.     Unindicted Co-conspirator 1 resided in or around Anson, Texas.

45.     Ascend Professional Consulting, Inc. (APC), was a Texas company. Formed on August 21, 2015, the company is currently inactive.  The company began to operate as Ascend Professional Management, Inc. (APM) on October 9, 2015 and is currently inactive.  **William Todd Hickman** was a principal of both companies.

46.     Ascend MSO of Texas, LLC (Ascend), was a Texas limited liability company.  Formed on October 14, 2015, the company is currently inactive.  APM was the Managing Member.

47.     BenefitPro Consulting, LLC (BenefitPro), was a Texas limited liability company.  Formed on April 28, 2016, the company is currently inactive.  APM was the Managing Member.

48.     Eridanus MG, LLC (Eridanus), was a Texas limited liability company.  Formed on June 28, 2016, the company is currently inactive.  **William Todd Hickman** was the Manager.

49.     Geminorium MG, LLC (Geminorium), was a Texas limited liability company.  Formed on July 26, 2016, the company is currently inactive.  APM was the Managing Member.

50.     Herculis MG, LLC (Herculis), was a Texas limited liability company.  Formed on July 26, 2016, the company is currently inactive.  APM was the Managing Member.

51.     **William Todd Hickman** resided in or around Lumberton, Texas.

52.     Individual 1 resided in or around Beaumont, Texas.

53.     Zalegon Sales Associates, LLC (Zalegon), is a Texas limited liability company.  Formed on March 25, 2014, the company is currently active.  **Christopher Roland Gonzales** is the Manager.

54.     **Christopher Roland Gonzales** resided in or around McKinney, Texas.  He was a recruiter for MSOs that paid kickbacks to providers in Texas.

55.     Next Level Healthcare Consultants, LLC (Next Level), was a Texas limited liability company.  Formed on May 16, 2014, the company is currently inactive.  **Ruben Daniel Marioni** and **Jordan Joseph Perkins** were both Members.

56.     Regal Health Solutions, LLC (Regal), was a Texas limited liability company.  Formed on February 26, 2016, the company is currently inactive.  **Ruben Daniel Marioni** and **Jordan Joseph Perkins** were both Members.

57.     **Ruben Daniel Marioni** resided in or around Spring, Texas.

58.     **Jordan Joseph Perkins** resided in or around Conroe, Texas.

59.     **Elizabeth Ruth Seymour** resided in or around Corinth, Texas.

60.     Balinh, Inc. (Balinh), was a Texas company.  Formed on August 27, 1998, the company is currently active.  **Linh Ba Nguyen** and **Thuy Ngoc Nguyen** are principals.

61.     **Linh Ba Nguyen** resided in or around Dallas, Texas.

62.     **Thuy Ngoc Nguyen** resided in or around Dallas, Texas.

63.     **Joseph Gil Bolin** resided in or around Dallas, Texas.

64.     **Heriberto Salinas** resided in or around Cleburne, Texas.

65.     Heriberto Salinas, M.D., P.A., is a Texas company.  Formed on February 18, 2014, the company is currently active.  **Heriberto Salinas** is the Director.

66.     **Hong Davis** resided in or around Lewisville, Texas.

67.     Hong Davis, M.D., P.A., is a Texas company.  Formed on June 20, 2003, the company is currently active.  **Hong Davis** is the President.

## COUNT 1

<u>Violation</u>:  18 U.S.C. § 371
(Conspiracy to Commit Illegal
Remunerations)

1.     The General Allegations sections of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.     From in or around July 1, 2015, and continuing thereafter until or about January 9, 2018, the exact dates being unknown to the Grand Jury, in the Eastern District of Texas, and elsewhere, the defendants, **Susan L. Hertzberg**, **Matthew John Theiler**, **David Weldon Kraus**, **Jeffrey Paul Parnell**, **Thomas Gray Hardaway**, **Laura Spain Howard**, **Jeffrey Paul Madison**, **Todd Dean Cook**, **William Todd Hickman**, **Christopher Roland Gonzales**, **Ruben Daniel Marioni**, **Jordan Joseph Perkins**, **Elizabeth Ruth Seymour**, **Linh Ba Nguyen**, **Thuy Ngoc Nguyen**, **Joseph Gil Bolin**, **Heriberto Salinas**, and **Hong Davis**, knowingly and willfully conspired and agreed with each other, with Individual 1, and with others, both known and unknown to the Grand Jury, to commit and abet certain offenses against the United States:

        a.     to violate the Anti-Kickback statute by knowingly and willfully soliciting or receiving any remuneration, including any kickback, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring beneficiaries for the furnishing or arranging for the furnishing of any item or service or in return for or in return for ordering or recommending the ordering of any item or service for which payment may be made in whole or in part under a Federal

health care program, in violation of 42 U.S.C. §§ 1320a-7b(b)(1)(A)

and 1320a-7b(b)(1)(B); and

    b.    to violate the Anti-Kickback statute by knowingly and willfully

offering or paying remuneration, including any kickback, directly or

indirectly, overtly or covertly, in cash or in kind, to any person to

induce the referral of beneficiaries for the furnishing or arranging for

the furnishing of any item or service or to induce another person to

order or arrange for or recommend the ordering of any item or

service for which payment may be made in whole or in part under a

Federal health care program, in violation of 42 U.S.C. §§ 1320a-

7b(b)(2)(A) and 1320a-7b(b)(2)(B).

### Object of the Conspiracy

3.    It was the object of the conspiracy for the defendants, **Susan L. Hertzberg**,
**Matthew John Theiler, David Weldon Kraus, Jeffrey Paul Parnell, Thomas Gray
Hardaway, Laura Spain Howard, Jeffrey Paul Madison, Todd Dean Cook, William
Todd Hickman, Christopher Roland Gonzales, Ruben Daniel Marioni, Jordan
Joseph Perkins, Elizabeth Ruth Seymour, Linh Ba Nguyen, Thuy Ngoc Nguyen,
Joseph Gil Bolin, Heriberto Salinas**, and **Hong Davis**, and their co-conspirators to
unlawfully enrich themselves by paying and receiving kickbacks in exchange for the
referral of and arranging for and ordering and recommending the ordering of health care
business for which payment may be made in whole or in part under Federal health care

programs, to conceal the kickback arrangement, and to use the kickbacks and the proceeds of the kickback arrangement for their personal benefit, as well as that of others.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among others, the following:

4.       Both Little River and Stamford utilized a network of MSOs that purported to offer investment opportunities to health care providers (HCPs) throughout the State of Texas.  In reality, the MSOs were a means to facilitate payments to HCPs in return for the providers' laboratory referrals.

5.       Pursuant to the kickback scheme, the hospitals paid a portion of their laboratory profits to recruiters, who in turn kicked back those funds to the referring providers who ordered BHD tests from the hospitals or from BHD directly.  BHD executives and sales force personnel leveraged the MSO kickbacks to gain and increase provider referrals and, in turn, to increase their revenues, bonuses, and commissions.  To increase reimbursement, one of the hospitals, LRH, falsely billed the laboratory tests as hospital outpatient services.  Moreover, as part of the scheme, providers were encouraged by the laboratories, hospitals, and recruiters to routinely order large panels of laboratory tests for patients, even when not reasonable and necessary.

6.       **Laura Spain Howard, William Todd Hickman, Christopher Roland Gonzales, Ruben Daniel Marioni, Jordan Joseph Perkins, Elizabeth Ruth Seymour, Linh Ba Nguyen, Thuy Ngoc Nguyen, Joseph Gil Bolin, Joseph Gil Bolin, Heriberto**

**Salinas**, and **Hong Davis**, individually and through their companies, generated business for BHD, Little River, and Stamford in exchange for kickback payments.

### Little River Hospital Arrangement

<u>LRH Submitted False Outpatient Claims to Receive Higher Reimbursement</u>

7.      LRH was a CAH in Rockdale, Texas (population under 6,000). LRH received cost-plus reimbursement when it submitted claims to Medicare for laboratory testing on hospital outpatients.  Such cost-plus reimbursement significantly exceeded the reimbursement available under the CLFS for claims to Medicare for laboratory testing on nonpatients of LRH.

8.      CAHs also receive higher reimbursement when they submit claims for other ancillary services, such as sleep studies or electroencephalogram (EEG) tests, performed on hospital outpatients.

9.      The higher reimbursement Medicare pays to CAHs like LRH is meant to ensure that patients in rural communities, such as in Rockdale, Texas, can access necessary hospital care.

10.      Rather than focus on providing necessary hospital care to the community, LRH CEO **Jeffrey Paul Madison**, **Todd Dean Cook**, and their co-conspirators implemented a plan to defraud federal healthcare programs by funneling claims for ancillary services, including laboratory tests, for hospital non-patients through LRH for higher reimbursement.

11.      As described more fully below, **Jeffrey Paul Madison** and **Todd Dean Cook** agreed with BHD and its executives to bill federal healthcare programs for

laboratory testing performed by BHD.  **Madison** and **Cook** agreed to pay recruiters to arrange for and recommend to providers throughout Texas laboratory testing through LRH for beneficiaries who were neither LRH inpatients nor LRH outpatients.

12.  To further the scheme, **Jeffrey Paul Madison** and **Todd Dean Cook** agreed to pay phlebotomists located in the offices of primary care providers (PCPs) throughout Texas to draw the beneficiaries' blood.  Often, these phlebotomists were previously employed by the PCP's office, BHD, or other laboratories.  Pursuant to the scheme, LRH employees and recruiters directed the phlebotomists located in PCPs' offices to create false hospital registration records identifying the PCPs' patients as LRH outpatients for purposes of receiving laboratory tests performed by BHD.

13.  LRH's claims to federal healthcare programs for laboratory testing falsely represented, among other things, that the tests were for LRH outpatients, when in fact the beneficiaries were not patients of LRH.

14.  Many of the beneficiaries were more than 100 miles away from LRH and had never even heard of the hospital, much less ever been a patient there.

15.  Nearly all of the providers who ordered BHD laboratory testing through LRH had no admitting privileges at LRH, had never practiced at LRH, had never referred to LRH before participating in the MSO kickback scheme, and had never even visited LRH's Rockdale hospital.

16.  To induce providers' referrals for ancillary services reimbursed by federal healthcare programs, including laboratory tests, **Jeffrey Paul Madison**, **Todd Dean Cook**, and their co-conspirators agreed to pay thousands of dollars to providers who

**Indictment – Page 19**

referred to LRH, while disguising the payments as purported MSO investment distributions.

LRH's Role in the MSO Kickback Scheme

17.     In or about 2014, LRH developed a "growth plan" to take advantage of LRH's "higher reimbursement levels and government subsidies." Aware that as a CAH, LRH received "cost based reimbursement which enhances financial performance for rural hospitals," LRH developed a plan for "immediate near term significant growth."

18.     In 2015, LRH expanded the scheme to include blood testing. **Jeffrey Paul Madison**, on behalf of LRH, agreed to pay per-test fees to BHD to run blood tests for LRH.  To gain referrals, LRH paid recruiters to arrange for health care providers' (HCPs) referrals and recommend the ordering of blood testing, and the recruiters kicked back some of those payments to the referring HCPs, while disguising the payments to HCPs as investment distributions from an MSO.  The MSO-incentivized HCPs ordered BHD testing from LRH.  LRH then billed for the blood tests to federal healthcare programs as outpatient services, falsely representing that (a) the claims did not result from AKS or Stark Law violations; (b) the tests were for LRH outpatients, when in fact the tests were for persons who were not patients at LRH at all; and (c) the claims were for reasonable and necessary services.

19.     LRH funded the MSO kickbacks to HCPs, with the knowledge and approval of **Jeffrey Paul Madison**.  LRH paid recruiters to generate commercial and federal laboratory testing referrals; the recruiters transferred a portion of the funds to their

MSO entities; the MSOs paid the referring HCPs to induce their referrals and orders to LRH; and LRH submitted the resulting claims to Medicare, Medicaid, and TRICARE.

20.    A summary of the amounts billed to and paid by Medicare are as follows:

a.   Medicare was billed more than $961,483.34 for blood tests generated by **Elizabeth Ruth Seymour** through Little River.  Medicare paid more than $357,866.47 for those tests.

b.   Medicare was billed more than $1,224,107.15 for blood tests generated by **Linh Ba Nguyen** through Little River.  Medicare paid more than $454,173.63 for those tests.

c.   Medicare was billed more than $603,827.40 for blood tests generated by **Thuy Ngoc Nguyen** through Little River.  Medicare paid more than $224,863.16 for those tests.

d.   Medicare was billed more than $187,782.00 for blood tests generated by **Joseph Gil Bolin** through Little River.  Medicare paid more than $69,929.44 for those tests.

e.   Medicare was billed more than $272,363.20 for blood tests generated by **Heriberto Salinas** through Little River.  Medicare paid more than $101,426.87 for those tests.

f.   Medicare was billed more than $122,762.00 for blood tests generated by **Hong Davis** through Little River.  Medicare paid more than $45,716.23 for those tests.

21.     In their discussions with recruiters, **Jeffrey Paul Madison** and **Todd Dean Cook** understood that the recruiters would offer and pay money to referring HCPs to induce them to order laboratory testing from LRH.  **Madison** and **Cook** understood that the recruiters would attempt to disguise the kickback payments to HCPs as purported distributions from an MSO.  **Madison** and **Cook** met and corresponded with the recruiters and agreed to the MSO kickback scheme.

Individual 1 and William Todd Hickman

22.     In early-2015, **Jeffrey Paul Madison** described to Individual 1 the MSO model that LRH and its recruiters were using to provide financial incentives to HCPs to order testing from LRH.  In or about April 2015, **Madison** offered Individual 1 the opportunity to be paid by LRH for recruiting HCPs to order ancillary services from LRH.

23.     Individual 1 agreed to be paid to arrange for HCP referrals and recommend the ordering of tests to LRH.  Like LRH's other recruiters, **Jeffrey Paul Madison** understood that Individual 1 would kickback a portion of the payments he received to referring HCPs, in the form of MSO payments, to induce the HCPs' referrals to LRH.

24.     On or about July 1, 2015, **Jeffrey Paul Madison**, on behalf of LRH, and Individual 1, on behalf of APC, entered into a marketing services agreement.

25.     Individual 1 partnered with **Laura Spain Howard** and **Christopher Roland Gonzales** to recruit physicians to refer to LRH in return for kickback payments. **Howard** and **Gonzales** each had experience as sales representatives in Texas and knew numerous HCPs in Texas.  **Howard** and **Gonzales** met and spoke with HCPs to offer MSO payments to induce the HCPs' referrals to LRH.  **Howard** and **Gonzales** provided

documents to prospective HCP participants, arranged for and recommended that the HCPs order laboratory tests through LRH, and distributed payment checks to referring HCPs.

26.     In or about August 2015, **William Todd Hickman** joined the MSO kickback scheme.  To further the scheme, Hickman founded, owned, and operated numerous corporate entities.  He created APC to receive payments from LRH and make payments to an MSO, to himself, and to another company he created called APM.

27.     **William Todd Hickman** created APM to receive payments from APC to pay himself and others.

28.     **William Todd Hickman** created Ascend MSO of TX LLC (Ascend MSO) to receive payments from APC, to pay recruiters like **Christopher Roland Gonzales**, and to pay HCPs who referred to LRH.

29.     In or about August 2015, Ascend MSO recruiters **Christopher Roland Gonzales** and **Laura Spain Howard** began implementing the MSO kickback scheme, through Ascend, targeting HCPs, offering kickbacks, and coordinating with BHD and their personnel.

30.     Ascend MSO's marketing director summarized the financial inducements in a pro forma sent to **Laura Spain Howard** and **Christopher Roland Gonzales**.  In the Ascend MSO pro forma for a "[g]roup of 10 doctors," HCP owners were told they would have "multiple revenue streams," and would receive a share of the revenue generated by their referrals for toxicology testing, blood testing, EEG tests, sleep studies, and other ancillary services.

31.     In their sales pitches to HCPs, the Ascend MSO recruiters focused on the amount of money that HCPs would receive.

32.     As an example, in or about October 2015, **Laura Spain Howard** and **Christopher Roland Gonzales** offered Ascend MSO kickbacks to **Hong Davis** of Plano, Texas, to induce her to order BHD tests through LRH.  Before being offered the kickbacks, she had never referred to LRH, a hospital nearly 200 miles away in Rockdale, Texas.  After agreeing on or about October 20, 2015 to receive the Ascend MSO kickbacks, **Davis** began referring patients, including Medicare beneficiaries, to LRH for lab testing.

33.     Ascend MSO's offer and payment of MSO kickbacks to **Hong Davis** resulted in, among other things, dozens of Medicare referrals by **Davis** from in or around November 2015 to July 2016.  LRH submitted those claims to Medicare as purported outpatient services, and Medicare paid thousands of dollars to LRH.

34.     Like **Hong Davis**, the HCPs who joined the MSO kickback scheme and referred laboratory tests and other ancillary services to LRH profited handsomely.

35.     Little River paid more than $4.1 million to Ascend for the referral of and arranging for and ordering and recommending the ordering of health care business.

36.     The chart below summarizes Ascend MSO payments from February 2016 to November 2017 to specific referring HCPs to induce their referrals and orders to LRH:

| HCP | MSO Payments |
| --- | --- |
| Elizabeth Seymour | $49,000.00 |
| Heriberto Salinas | $55,870.84 |
| Hong Davis | $55,870.84 |
| Joseph Bolin | $55,870.84 |

| HCP | MSO Payments |
|---|---|
| Thuy Ngoc Nguyen and Linh Ba Nguyen | $111,741.68 |

37.     Ascend MSO owner **William Todd Hickman** and Ascend MSO recruiters **Laura Spain Howard** and **Christopher Roland Gonzales** received hundreds of thousands of dollars for their acts in furtherance of the kickback scheme.

38.     At **William Todd Hickman's** direction, APM paid **Hickman's** company, Hickman Tax and Retirement Advisors, $389,221.57 in 2016.

39.     **Laura Spain Howard** sought to conceal her role in the kickback scheme. Rather than receive payments directly from an Ascend entity, **Laura Spain Howard** and **Christopher Roland Gonzales** agreed that **Gonzales'** company, Zalegon Sales Associates LLC (Zalegon), would receive the payments, and that **Gonzales** would then share the proceeds with **Howard**.  In 2016, Ascend MSO paid Zalegon $506,823.87.

40.     Per his agreement with **Laura Spain Howard**, **Christopher Roland Gonzales** deposited the checks Zalegon received from Ascend MSO and withdrew cash to share with **Howard**.  **Gonzales** paid **Howard** about $10,000 in cash per month, except for December 2016, when **Gonzales** paid **Howard** about $70,000 in cash.  Each month, from May to December 2016, **Gonzales** delivered the cash in a bag to **Howard**.  Once **Howard** received the bag full of cash from **Gonzales**, she placed it in the safe in her home, with the cash still in the bag.  In total, **Gonzales** paid **Howard** about $140,000 in cash from Ascend MSO.  **Howard** did not declare any of the payments to federal or state tax authorities.

<u>LRH Partners with BHD</u>

41.     For the laboratory scheme to succeed, **Jeffrey Paul Madison** knew LRH would need to partner with a clinical laboratory to run the tests ordered by the HCPs. LRH did not have the capability in 2015 to perform specialized laboratory testing, lacking the needed personnel and laboratory equipment, among other things.  LRH first partnered with BHD, and later with a BHD competitor.

42.     For a fee, BHD allowed LRH to bill their blood tests to insurers, including federal healthcare insurers, as purported hospital outpatient services, with LRH charging insurers a much higher rate than BHD could receive as a clinical laboratory.

43.     **Susan L. Hertzberg**, **Matthew John Theiler**, and **Laura Spain Howard** knew that the individuals receiving BHD testing through LRH were neither inpatients nor outpatients of LRH because BHD personnel participated with MSO recruiters in sales visits to the referring HCPs and understood that the individuals were patients of the HCPs, not hospital patients.

44.     As part of the conspiracy, **Jeffrey Paul Parnell**, **Thomas Gray Hardaway**, **Laura Spain Howard**, and other BHD personnel helped the MSOs affiliated with LRH to identify HCP targets, referred HCPs interested in kickback payments to the MSOs to secure their blood testing referrals, and participated with the MSOs in sales pitches to offer HCPs money to induce their referrals and orders.

45.     On or about December 5, 2014, **Susan L. Hertzberg** signed a merger agreement to transfer 100% of the shareholding in BHD to Eurofins Clinical Testing US Holdings, Inc. (Eurofins).  The merger closed on or about January 30, 2015.  Pursuant to

the merger agreement, the purchase price consisted of a closing payment plus a contingent "earnout" payment.  The earnout payment was to be calculated based on BHD's profitability during 2016 and 2017 (the earnout period).  As part of the earnout provisions, **Hertzberg**, **Matthew John Theiler**, and other BHD executives would remain in place with significant managerial independence from Eurofins during the earnout period.  **Hertzberg** and **Theiler** stood to receive about 7.9 percent and 1.3 percent, respectively, of the earnout payment, contingent on BHD's profitability during the earnout period.

46.     Shortly after the merger closed, a physician who had a financial relationship with LRH alerted **Susan L. Hertzberg** that LRH's CEO, **Jeffrey Paul Madison**, was reaching out to a competitor laboratory to discuss a potential "lucrative deal."  The physician told **Hertzberg** that LRH "want[s] to bill for labs themselves" because they have "great" contracts with payors.  **Hertzberg** replied, "I'm on it! Stay tuned!"  The physician then gave **Madison**'s contact information to **Hertzberg**.

47.     On or about April 1, 2015, **Susan L. Hertzberg** approved LRH's proposed arrangement with BHD, and **Jeffrey Paul Madison** signed the agreement.  Described as a "buy and bill contract," **Hertzberg** allowed LRH to bill BHD tests to insurers, including federal healthcare programs, in return for a fee paid to BHD.

48.     In or about April 2015, LRH performed a "test pilot" of submitting one physician's BHD tests to insurers as purported hospital outpatient laboratory testing.  Once they saw that the billing scheme generated significantly more reimbursement, based on a CAH submitting the claims rather than a clinical laboratory, **Jeffrey Paul Madison**

began paying MSO recruiters to arrange for or recommend that HCPs order BHD testing through LRH.

49.     BHD's sales force, with **Susan L. Hertzberg's** knowledge and approval, worked closely with recruiters who paid MSO kickbacks to induce referrals to LRH for BHD testing.  For example, in or about May 2015, **David Weldon Kraus** confirmed to **Jeffrey Paul Parnell** and **Thomas Gray Hardaway** that he had joined MSO recruiters at a dinner to recruit six physicians to order BHD tests through LRH; after the MSO pitch, "4 [physicians] have moved forward with joining the MSO."  **Kraus** highlighted the impact of the MSO pitch on one physician who estimated he referred 100 patients per month to another laboratory: "After [the MSO recruiters] discussed the MSO, he is probably going to use us."

50.     Fueled by the MSO kickbacks, referrals to LRH for BHD testing increased rapidly.  One LRH-affiliated physician told **Susan L. Hertzberg** in or about June 2015, "We've been smoking it! Hundreds and hundreds of labs. Gray [Hardaway] is beside himself!"

51.     As the LRH arrangement progressed, **Susan L. Hertzberg** and **Matthew John Theiler** closely tracked the revenue that BHD received from the arrangement.  In September 2015, **Hertzberg** reviewed data showing that BHD had received over $1 million to date from LRH.  Based on the average LRH orders for BHD testing over the prior four weeks, BHD's annualized revenue associated with LRH would be $20,866,560—an increase of $19,166,560 from BHD's "base business" without LRH.  Upon reviewing those revenue numbers, and a chart showing the quickly rising rate of

referrals, **Hertzberg** contacted other BHD executives, including **Theiler** and **Kraus**, stating "WOWIE!!!!! HOW DO WE GET SOME MORE OF THAT???!!!!!!!"  In a separate email, **Hertzberg** stated, "I would like to fly out and meet with them. Dinner with [an LRH-affiliated physician] and CEO of Little River. Who can help put this together?"

52.     The following month, **David Weldon Kraus** replied to an email on the topic of MSOs, stating, "Looks good so far. I did find out the MSO's working with Little River are not providing any management/administrative services for the office. The MSO's offer the access to testing, both Boston and toxicology through Little River, then other offerings through other labs/companies for genetics, medical equipment, etc. Little River has 3 "Marketers" working for them. Next Level and a couple more. Heard their lawyer (Little River's) advised them to acquire practices in the areas where they are ordering tests (Houston, Dallas) for compliance reasons/passing the sniff test."

53.     The same month, **David Weldon Kraus** informed **Susan L. Hertzberg** that the CEO of a competitor laboratory to BHD had spoken with **Jeffrey Paul Madison** and was in negotiations with LRH "for a similar model/arrangement as BHD." **Hertzberg** replied, "I would expect everyone is talking to them [LRH]."  To preserve BHD's revenue from the LRH arrangement, **Hertzberg** told **Kraus**: "[W]e need to keep our touch high and service levels even higher!"  **Kraus** agreed and noted to **Hertzberg** the "problems" BHD was having in "filtering clients with pure intent" who were referred by an MSO working with LRH.

54.     Despite these problems, **Susan L. Hertzberg** and **Matthew John Theiler** continued the lucrative LRH scheme.  Indeed, because of the substantial revenue the LRH arrangement was generating for BHD, **Hertzberg** worked with **Theiler** on plans to expand the arrangement into a formal joint venture to prevent LRH from working with competitors to BHD.  Under **Hertzberg and Theiler's** proposed joint venture, BHD would have helped LRH develop and operate an on-site laboratory.

55.     **Susan L. Hertzberg** and **Matthew John Theiler** knew why the existing LRH arrangement was lucrative.  As **David Weldon Kraus** highlighted to **Theiler** in or about October 2015, the MSOs "work with [LRH]," "practitioners partner[] with MSO" for their testing and "share in profits of MSO," and BHD receives leads from the MSOs for new physician clients.  **Kraus** noted that the MSOs allow physicians to order "testing, both Boston and toxicology, through [LRH]."  Despite calling themselves MSOs, the BHD sales director noted to **Theiler** that "the MSOs working with [LRH] are not providing any management/administrative service for the office."

56.     The joint venture contemplated by **Susan L. Hertzberg** and **Matthew John Theiler** would have required approval by BHD's parent company in Europe.  At **Theiler's** request, **David Weldon Kraus**, with assistance from **Jeffrey Paul Parnell** and **Thomas Gray Hardaway**, prepared a three-page executive summary of the LRH arrangement for **Hertzberg** to use when discussing her proposed LRH joint venture with BHD's parent company.  The summary explained how LRH's "unique" status as a CAH gave it "very favorable reimbursement," allowing it to "receive cost-based reimbursement from Medicare, instead of standard fixed reimbursement rates."  BHD's

summary acknowledged that cost-based reimbursement was designed "to enhance the financial performance of small rural hospitals" like LRH.  The summary noted that LRH had "10 patient beds" and "originally served the Central Texas area, but over the last year, has increased [its] relationships with medical providers in Houston, Dallas and other cities in Texas and Oklahoma."

57.     The executiye summary that **David Weldon Kraus** prepared at **Matthew John Theiler's** request also indirectly described the kickbacks that LRH used to induce physicians to refer lab testing to LRH, explaining that a "driver for growth for [LRH] and other hospitals is the [MSO] model."  The summary noted that the "hospitals will employ Marketers.  These Marketers represent [MSOs]."  It further noted that "practitioners . . . become investors by purchasing shares in the MSOs.  [LRH] will remunerate the Marketers/MSO, which in turn disperse their profits among the investors."

58.     **Susan L. Hertzberg** and **Matthew John Theiler** knew of the broad reach of LRH's MSOs in recruiting HCPs to order BHD tests through LRH.  In or about October 2015, **Theiler** noted to **Hertzberg** that "the MSO [for LRH was] recruiting physicians outside of Austin and into other markets."  BHD's VP for Hospital Strategy confirmed this point to **Hertzberg** and **Theiler** a few days later, noting that LRH's marketing arm was recruiting "way outside of the [LRH] access area for patients," even though a "[CAH] exists to provide access and does not typically have a marketing arm."  The VP warned **Hertzberg** and **Theiler** to "reel this in" and "stand down on all hospitals, particularly in [Texas]."

59.     **Susan L. Hertzberg** and **Matthew John Theiler** chose not to end BHD's participation in the MSO kickback scheme, given of the lucrative nature of their LRH arrangement.  Instead, **Hertzberg** and **Theiler** tracked the "LR[H] accounts, with volumes, how they were put under LR[H], and how they were in-serviced [by BHD]."  In or about November 2015, **Theiler** sent **Hertzberg** a detailed spreadsheet listing, among other things, the names, referral volumes, and referral start dates for 128 HCPs for whom an MSO relationship was the "source of referral to [BHD]," who were listed as responsible for 2,185 referrals in just the past month.  **Theiler** even forwarded to **Hertzberg** the name and phone number of "MSO/Marketer Marty Flores," who was a recruiter for the Next Level MSOs.

60.     On or about November 17, 2015, **Susan L. Hertzberg** and **Matthew John Theiler** met with **Jeffrey Paul Madison** and other LRH representatives in Round Rock, Texas.

61.     On or about December 9, 2015, **Jeffrey Paul Parnell** emailed **David Weldon Kraus**, copying **Thomas Gray Hardaway**, advising, "…another driver for growth for Little River and other hospitals is the Management Services Organization model. Little River will employ Marketers. These Marketers represent MSOs, delete – which allow the practitioners to become investors in these MSO's change to. The practitioners become investors by purchasing shares in the MSO. Little river will remunerate the Marketers/MSO, which in turn disperse their profits among the investors."

62.     Despite discussing the proposed LRH joint venture with BHD's parent company, **Susan L. Hertzberg** and **Matthew John Theiler** did not tell the company about the MSO kickbacks.

63.     BHD's parent company did not approve **Susan L. Hertzberg's** proposed joint venture to develop LRH's on-site lab, but that decision did not dissuade **Hertzberg** and **Matthew John Theiler**.  They continued BHD's arrangement with LRH, in which BHD performed the laboratory testing, the recruiters paid the MSO kickbacks, and LRH submitted claims to insurers for the tests.

64.     As intended by **Susan L. Hertzberg** and **Matthew John Theiler**, BHD's participation with LRH and others in the hospital billing and MSO scheme was highly lucrative, with LRH paying BHD over $30 million.

**Stamford Hospital Arrangement**

Stamford's Role in the MSO Kickback Scheme

65.     In light of the success of the kickback scheme, a number of LRH's co-conspirators agreed to continue the MSO kickback scheme with another Texas hospital. To induce HCPs' referrals for ancillary services reimbursed by federal healthcare programs, including laboratory tests, the co-conspirators agreed to a scheme to pay thousands of dollars to referring HCPs, while disguising the payments as purported MSO investment distributions.

66.     From late 2015 to early 2016, Individual 1 and others solicited another rural CAH in Texas to participate in their laboratory scheme.  The individuals targeted a small

hospital with 25 or fewer beds named Jones County Regional Healthcare d/b/a Stamford Memorial Hospital (Stamford) in Stamford, Texas (population under 4,000).

67.     Individual 1 and another individual met with Stamford's CEO, Unindicted Co-conspirator 1, on or about December 29, 2015 to discuss a laboratory billing arrangement based on the LRH model.  Individual 1's partner subsequently provided Stamford's CEO with "actual figures" from LRH, pointing to the "explosive growth" generated by the hospital billing for blood tests, noting that the associated revenue to the hospital was over $94 million and "entirely incremental for the Hospital."

68.     During the same time period, on or about January 12, 2016, Individual 1 met with **Matthew John Theiler** and **Laura Spain Howard** in Dallas, Texas.

69.     Individual 1 met with others on multiple occasions, including on or about March 7, 2016 in Frisco, Texas, and discussed the potential laboratory arrangement with Stamford.  To secure Stamford's participation, Individual 1 and others met with Stamford's CEO, Unindicted Co-conspirator 1, and had numerous communications with him and other Stamford representatives, including an in-person meeting on or about March 22, 2016.

70.     In or about April 2016, **Susan L. Hertzberg** and **Matthew John Theiler** decided to join the Stamford arrangement.  Between April and June 2016, **Theiler** had multiple communications with Individual 1 and Stamford representatives and discussed the arrangement and negotiated contract pricing with them.

71.     Effective on or about May 31, 2016, BHD entered into a laboratory services agreement with Stamford.  Pursuant to the agreement, which **Matthew John Theiler**

negotiated and sought approval for within BHD, Stamford agreed to pay BHD for performing laboratory tests on specimens that Stamford sent to BHD.

72.     Under their arrangements with Stamford, BHD agreed to perform laboratory testing for Stamford for a per-test fee.

73.     As part of the Stamford arrangement, for laboratory tests BHD performed, Stamford and/or its contractor billed commercial insurers in Stamford's name using Stamford's NPI, and BHD billed federal insurers in BHD's name using BHD's NPI.

74.     For patients covered by commercial insurance, Stamford billed commercial insurers and agreed to pay a per-test fee to the laboratory that performed the testing.  For patients covered by Medicare, Medicaid, and TRICARE, BHD billed the federal healthcare programs.

75.     A summary of the amounts billed to and paid by Medicare are as follows:

    a.   BHD billed Medicare more than $3,711,650.64 for blood tests generated by **Elizabeth Ruth Seymour**.  Medicare paid BHD more than $639,144.55 for those tests.

    b.   BHD billed Medicare more than $3,285,733.00 for blood tests generated by **Linh Ba Nguyen**.  Medicare paid BHD more than $544,885.03 for those tests.

    c.   BHD billed Medicare more than $930,361.13 for blood tests generated by **Thuy Ngoc Nguyen.**  Medicare paid BHD more than $169,787.63 for those tests.

d.  BHD billed Medicare more than $263,158.00 for blood tests generated by **Joseph Gil Bolin**.  Medicare paid BHD more than $36,378.38 for those tests.

e.  BHD billed Medicare more than $273,058.00 for blood tests generated by **Heriberto Salinas**.  Medicare paid BHD more than $42,093.05 for those tests.

f.  BHD billed Medicare more than $104,911.00 for blood tests generated by **Hong Davis**.  Medicare paid BHD more than $15,592.13 for those tests.

76.     In coordination with the BHD and BenefitPro, a company owned and operated by **William Todd Hickman** and affiliated with Individual 1, Unindicted Co-conspirator 1, on behalf of Stamford, and **Hickman**, on behalf of BenefitPro, entered into a management services agreement.

77.     In accordance with the agreement, Stamford paid for personnel to draw the blood for both commercial and federal patients, fill out applicable paperwork, and ship the blood specimens to BHD to perform the testing.

78.     To recruit physicians to order the laboratory testing, Stamford paid commissions to BenefitPro.  BenefitPro then kicked back a portion of the commissions to referring physicians, disguising the remuneration as MSO distribution payments but which were actually payments to induce the physicians' referrals to Stamford and BHD for laboratory testing.

79.     To fund the MSO kickbacks to HCPs, Stamford paid BenefitPro, which in turn transferred the funds to various MSOs to pay the referring HCPs.

80.     Stamford paid BenefitPro 25% of its net collections for ancillary services, including toxicology and laboratory testing, pursuant to an agreement that **William Todd Hickman** and Stamford's CEO, Unindicted Co-conspirator 1, signed on or about June 2, 2016.

81.     From November 2016 to November 2017, Stamford paid BenefitPro over $7.1 million.

82.     **William Todd Hickman** created multiple MSOs to receive payments from BenefitPro, to pay recruiters like **Christopher Roland Gonzales**, and to pay referring HCPs.  Those MSOs were named Cygnus MG LLC, Eridanus MG LLC, Geminorium MG LLC, Herculis MG LLC, Indus MG LLC, Juka MG LLC, and Korvus MG LLC (collectively, the BenefitPro MSOs).

83.     In or about August 2016, BenefitPro recruiters, **Christopher Roland Gonzales** and **Laura Spain Howard**, began implementing the MSO kickback scheme, through BenefitPro, targeting HCPs, offering kickbacks, and coordinating with Stamford and their personnel.

84.     In their sales pitches to HCPs, the BenefitPro recruiters focused on the amount of money that HCPs would receive.

85.     Numerous HCPs knew about MSO kickbacks from prior experience.  At least nineteen HCPs who had received kickbacks from Ascend MSO also received kickbacks from the BenefitPro MSOs.  Those HCPs included **Elizabeth Ruth Seymour**,

**Linh Ba Nguyen**, **Thuy Ngoc Nguyen**, **Joseph Gil Bolin**, **Heriberto Salinas**, and **Hong Davis**, among others.

86.    The purpose of the Stamford MSO scheme was to pay HCPs for their referrals, as those involved knew.  For example, Stamford's COO, who reported to the CEO and regularly interacted with participating HCPs, BenefitPro, and BHD, described the arrangement in May 2016 as a "joint venture" involving "blood draws, toxicology screens (urine) and sleep studies and EEGs," where the "doctors get paid through a Managed Service Organization (MSO)."

87.    The COO later acknowledged to colleagues that "the doctors like us and appreciate the level of customer service we provide, but they are all about the money and who can give them the most."  The COO noted that "the longer we participate in this program I realize it is all about who can give them the most as many of them can't make ends meet with their current practice models.  They are independent of their local hospitals and many of them struggle financially.  So they look for programs like this to give them additional income."  The COO noted that "unfortunately the doctors follow the money."

88.    Stamford paid BenefitPro more than $7,150,000.00 for the referral of and arranging for and ordering and recommending the ordering of health care business.  BenefitPro, in turn, paid other entities for the referral of and arranging for and ordering and recommending the ordering of health care business as follows:

      a.  BenefitPro paid Eridanus $614,708.77.

      b.  BenefitPro paid Geminorium $310,683.20.

    c.  BenefitPro paid Herculis $340,313.13.

    d.  BenefitPro paid Regal $751,358.23.

89.  From in or about November 2016 to January 2018, BenefitPro MSOs paid specific referring HCPs to induce their referrals and orders as follows:

| HCP | BenefitPro MSO | MSO Payments |
|---|---|---|
| Elizabeth Seymour | Eridanus | $232,314.95 |
| Heriberto Salinas | Herculis | $19,322.32 |
| Hong Davis | Herculis | $16,900.00 |
| Joseph Bolin | Herculis | $38,847.34 |
| Thuy Ngoc Nguyen and Linh Ba Nguyen | Geminorium | $90,664.85 |

90.  In addition to paying the referring HCPs, BenefitPro paid a significant portion of the money to **William Todd Hickman**, **Christopher Roland Gonzales**, and others.

91.  At **William Todd Hickman's** direction, BenefitPro transferred over $1.5 million to APM, which paid **Hickman's** company, Hickman Tax and Retirement Advisors, $356,699.92 in 2017.

92.  **Laura Spain Howard** sought to conceal her role in the kickback scheme. Rather than receive payments directly from a BenefitPro entity, **Laura Spain Howard** and **Christopher Roland Gonzales** agreed that **Gonzales'** company, Zalegon Sales Associates LLC (Zalegon), would receive the payments, and that **Gonzales** would then share the proceeds with **Howard**.  In 2016 and 2017, BenefitPro paid Zalegon $702,784.61.

93.     **Christopher Roland Gonzales** deposited the checks and paid **Howard** about $10,000 in cash per month, except for December 2016, when **Gonzales** paid **Howard** about $70,000 in cash.

94.     Per his agreement with **Laura Spain Howard**, **Christopher Roland Gonzales** deposited the checks Zalegon received from BenefitPro and withdrew cash to share with **Howard**.  Each month, from January 2017 to November 2017, **Gonzales** paid **Howard** about $10,000 in cash.  Each month, **Gonzales** delivered the cash in a bag to **Howard**.  Once **Howard** received the bag full of cash from **Gonzales**, she placed it in the safe in her home, with the cash still in the bag.  In total, **Gonzales** paid **Howard** about $110,000 in cash from BenefitPro.  **Howard** did not declare any of the payments to federal or state tax authorities.

Stamford's Partnership with BHD

95.     On or about May 31, 2016, Stamford and BHD executed a lab services agreement.  Stamford's CEO, Unindicted Co-conspirator 1, emailed the signed agreement to **Matthew John Theiler**.

96.     As part of the Stamford scheme, BHD agreed with Stamford and BenefitPro that the laboratories would bill federal healthcare programs for the resulting referrals of laboratory testing for federal healthcare program beneficiaries.  **Matthew John Theiler** agreed to this approach on behalf of BHD.

97.     **Matthew John Theiler** understood that Stamford was concerned about the legality of billing federal healthcare programs for claims referred by MSO participants.

**Theiler** agreed that BHD would bill those claims to capture the lucrative revenue from federal healthcare program referrals.

98.     On or about May 17, 2016, a Stamford representative emailed **Susan L. Hertzberg**, stating, "…The biggest challenge on the hospital side is getting a team of high performers to understand our role as enablers. The hospitals in this model are really about access – access to blood through phlebotomists; access to health plans through an in network partner; access to providers. Period."

99.     To that end and as agreed between among the parties, Stamford paid for phlebotomists located in the offices of HCPs who were receiving MSO kickbacks.  Often, those phlebotomists had previously worked in the particular HCPs' offices.

100.     Stamford paid the phlebotomists to draw the blood for patients with federal healthcare insurance and patients with commercial insurance.  Stamford, BenefitPro, and BHD instructed the phlebotomists to collect insurance information for federal healthcare beneficiaries and provide that information to BHD, so that BHD could bill for the claims.

101.     To ensure that they would receive the federal referrals from the kickback scheme, BHD provided the phlebotomists paid by Stamford with supplies for the blood specimens, laboratory-specific requisition forms, and laboratory-specific shipping supplies.

102.     Stamford, BenefitPro, and BHD instructed the phlebotomists to use the BHD requisition forms and shipping supplies for federal healthcare program beneficiaries.  Following those instructions was important to BHD so that BHD could bill the resulting federal claims.

103.   To ensure the success of the kickback scheme, and at the direction of **Matthew John Theiler**, BHD helped the BenefitPro MSOs identify HCP targets, referred HCPs interested in kickback payments to the BenefitPro MSOs to secure their blood testing referrals, participated with the MSOs in sales pitches to offer HCPs money to induce their referrals and orders, and sought to ensure that they would receive the federal referrals resulting from the kickbacks.

104.   As intended by **Susan L. Hertzberg** and **Matthew John Theiler**, BHD's participation with Stamford and others in the MSO scheme was lucrative, with Stamford paying BHD over $7.5 million.

### Overt Acts

In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Eastern District of Texas and elsewhere:

### APC and Little River

105.   On or about July 1, 2015, APC, through **William Todd Hickman** and Individual 1, entered into a written agreement with Little River for the referral of and arranging the furnishing and arranging for and recommending the ordering of health care business for which payment may be made in whole or in part under Federal health care programs.  APC acted as a recruiter for Little River.  According to the agreement, APC would receive 15% of reimbursements received by Little River for APC-generated referrals.  APC, in turn, paid physicians for the referral of and arranging for and ordering and recommending the ordering of health care business for which payment may be made in whole or in part under Federal health care programs.

Indictment – Page 42

106.   On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **Jeffrey Paul Madison**, **Todd Dean Cook**, and others, acting through Little River, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to APC to induce the referral of and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the arranging for or recommending the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **William Todd Hickman**, Individual 1, and others, acting through APC, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for arranging for and recommending the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 5/11/2016 | $321,942.61 | APM |
| b. | 6/2/2016 | $550,917.60 | APM |
| c. | 6/29/2016 | $509,000.09 | APM |
| d. | 8/2/2016 | $229,479.49 | APM |
| e. | 8/4/2016 | $10,000.00 | APM |
| f. | 9/13/2016 | $345,947.54 | APM |
| g. | 10/11/2016 | $772,747.91 | APM |
| h. | 11/9/2016 | $10,000.00 | APM |
| i. | 11/14/2016 | $617,624.76 | APM |
| j. | 12/2/2016 | $10,000.00 | APM |

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| k. | 12/7/2016 | $336,167.97 | APM |

**Ascend**

**Elizabeth Ruth Seymour**

107.   On or about April 4, 2016, Ascend entered into a written subscription agreement with **Elizabeth Ruth Seymour** under the guise of an investment into Ascend. The agreement represented that "The Subscriber has not been encouraged to invest or not invest based on potential referrals to the Company or its affiliates, no person has asked any questions regarding the potential to refer patients to the Company and there is no requirement or expectation that referrals be made to the Company or its affiliates." These were false statements as the subscribers were encouraged to invest based upon potential referrals to the Company or its affiliates; subscribers were asked questions regarding the potential to refer patients to the Company; and there was an expectation or requirement that referrals be made to the Company or its affiliates.  According to the Confidential Offering Memorandum, the Class A Members of the Company agreed that they would not refer any federal payor patient to any of the Healthcare Providers which the Company contracts for Management Services.

108.   After agreeing to receive the Ascend kickbacks, **Seymour** began referring to LRH for lab testing.  At times, **Seymour** was paid for purported marketing and consulting services.

109.   On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **William Todd**

Hickman, **Christopher Roland Gonzales, Laura Spain Howard**, Individual 1, and others, acting through Ascend, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Elizabeth Ruth Seymour** to induce the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Elizabeth Ruth Seymour** knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 7/25/2016 | $5,000.00 | Elizabeth Seymour |
| b. | 8/24/2016 | $5,000.00 | Elizabeth Seymour |
| c. | 9/28/2016 | $5,000.00 | Elizabeth Seymour |
| d. | 10/21/2016 | $10,000.00 | Elizabeth Seymour |
| e. | 12/1/2016 | $10,000.00 | Elizabeth Seymour |
| f. | 12/29/2016 | $10,000.00 | Elizabeth Seymour |

**Balinh**

110.    On or about October 5, 2015, Ascend entered into a written subscription agreement with **Linh Ba Nguyen** and **Thuy Ngoc Nguyen** through Balinh under the guise of an investment into Ascend.  The agreement represented that "The Subscriber has not been encouraged to invest or not invest based on potential referrals to the Company or its affiliates, no person has asked any questions regarding the potential to refer patients to the Company and there is no requirement or expectation that referrals be made to the Company or its affiliates."   These were false statements as the subscribers were encouraged to invest based upon potential referrals to the Company or its affiliates; subscribers were asked questions regarding the potential to refer patients to the Company; and there was an expectation or requirement that referrals be made to the Company or its affiliates.  According to the Confidential Offering Memorandum, the Class A Members of the Company agreed that they would not refer any federal payor patient to any of the Healthcare Providers which the Company contracts for Management Services.

111.    After agreeing to receive the Ascend kickbacks, **Linh Ba Nguyen** and **Thuy Ngoc Nguyen** began referring to LRH for lab testing.  At times, **Linh Ba Nguyen** and **Thuy Ngoc Nguyen** were paid through Balinh for purported marketing and consulting services.

112.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **William Todd Hickman, Christopher Roland Gonzales, Laura Spain Howard**, Individual 1, and others, acting through Ascend, knowingly and willfully paid remuneration, including any

kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Linh Ba Nguyen** and **Thuy Ngoc Nguyen**, through Balinh, to induce the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Linh Ba Nguyen** and **Thuy Ngoc Nguyen**, acting through Balinh, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 5/20/2016 | $5,000.00 | Balinh Inc. |
| b. | 5/20/2016 | $5,000.00 | Balinh Inc. |
| c. | 6/9/2016 | $12,877.68 | Balinh Inc. |
| d. | 7/8/2016 | $15,560.00 | Balinh Inc. |
| e. | 8/12/2016 | $13,652.00 | Balinh Inc. |
| f. | 9/9/2016 | $4,666.00 | Balinh Inc. |
| g. | 9/27/2016 | $10,586.00 | Balinh Inc. |
| h. | 11/18/2016 | $17,548.00 | Balinh Inc. |
| i. | 12/5/2016 | $16,892.00 | Balinh Inc. |
| j. | 1/30/2017 | $7,960.00 | Balinh Inc. |

**Joseph Gil Bolin**

113.    On or about September 24, 2015, Ascend entered into a written subscription agreement with **Joseph Gil Bolin** under the guise of an investment into Ascend.  The agreement represented that "The Subscriber has not been encouraged to invest or not invest based on potential referrals to the Company or its affiliates, no person has asked any questions regarding the potential to refer patients to the Company and there is no requirement or expectation that referrals be made to the Company or its affiliates." These were false statements as the subscribers were encouraged to invest based upon potential referrals to the Company or its affiliates; subscribers were asked questions regarding the potential to refer patients to the Company; and there was an expectation or requirement that referrals be made to the Company or its affiliates.  According to the Confidential Offering Memorandum, the Class A Members of the Company agreed that they would not refer any federal payor patient to any of the Healthcare Providers which the Company contracts for Management Services.

114.    After agreeing to receive the Ascend kickbacks, **Bolin** began referring to LRH for lab testing.  At times, **Bolin** was paid for purported marketing and consulting services.

115.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **William Todd Hickman, Christopher Roland Gonzales, Laura Spain Howard**, Individual 1, and others, acting through Ascend, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Joseph Gil**

**Indictment – Page 48**

**Bolin** to induce the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Joseph Gil Bolin** knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 5/6/2016 | $5,000.00 | Joseph Bolin M.D. |
| b. | 5/20/2016 | $6,438.84 | Joseph Bolin M.D. |
| c. | 6/13/2016 | $7,780.00 | Joseph Bolin M.D. |
| d. | 7/6/2016 | $6,826.00 | Joseph Bolin M.D. |
| e. | 8/16/2016 | $2,333.00 | Joseph Bolin M.D. |
| f. | 9/16/2016 | $5,293.00 | Joseph Bolin M.D. |
| g. | 10/18/2016 | $8,774.00 | Joseph Bolin M.D. |
| h. | 11/15/2016 | $8,446.00 | Joseph Bolin M.D. |
| i. | 12/16/2016 | $3,980.00 | Joseph Bolin M.D. |

**Heriberto Salinas**

116.    On or about November 5, 2015, Ascend entered into a written subscription agreement with **Heriberto Salinas** under the guise of an investment into Ascend.  The agreement represented that "The Subscriber has not been encouraged to invest or not invest based on potential referrals to the Company or its affiliates, no person has asked any questions regarding the potential to refer patients to the Company and there is no requirement or expectation that referrals be made to the Company or its affiliates."

**Indictment – Page 49**

These were false statements as the subscribers were encouraged to invest based upon potential referrals to the Company or its affiliates; subscribers were asked questions regarding the potential to refer patients to the Company; and there was an expectation or requirement that referrals be made to the Company or its affiliates.  According to the Confidential Offering Memorandum, the Class A Members of the Company agreed that they would not refer any federal payor patient to any of the Healthcare Providers which the Company contracts for Management Services.

117.    After agreeing to receive the Ascend kickbacks, **Salinas** began referring to LRH for lab testing.  At times, **Salinas** was paid through Heriberto Salinas, M.D., P.A., for purported marketing and consulting services.

118.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **William Todd Hickman, Christopher Roland Gonzales, Laura Spain Howard**, Individual 1, and others, acting through Ascend, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Heriberto Salinas** through Heriberto Salinas, M.D., P.A., to induce the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Heriberto Salinas**, acting through Heriberto Salinas, M.D., P.A., knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of any item and service for which payment may

be made in whole and in part under a Federal health care program and in return for the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 5/6/2016 | $5,000.00 | Heriberto Salinas, M.D., P.A. |
| b. | 5/20/2016 | $6,438.84 | Heriberto Salinas, M.D., P.A. |
| c. | 6/13/2016 | $7,780.00 | Heriberto Salinas, M.D., P.A. |
| d. | 7/16/2016 | $6,826.00 | Heriberto Salinas, M.D., P.A. |
| e. | 8/16/2016 | $2,333.00 | Heriberto Salinas, M.D., P.A. |
| f. | 9/16/2016 | $5,293.00 | Heriberto Salinas, M.D., P.A. |
| g. | 10/18/2016 | $8,774.00 | Heriberto Salinas, M.D., P.A. |
| h. | 11/15/2016 | $8,446.00 | Heriberto Salinas, M.D., P.A. |
| i. | 12/16/2016 | $3,980.00 | Heriberto Salinas, M.D., P.A. |

**Hong Davis**

119.    In or about October 2015, **Laura Spain Howard** and **Christopher Roland Gonzales** offered kickbacks through Ascend MSO to **Hong Davis** of Plano, Texas, to induce her to order BHD tests through LRH.  Before being offered kickbacks, **Davis** had never referred services to LRH, a hospital nearly 200 miles away in Rockdale, Texas.

120.    On or about October 20, 2015, Ascend entered into a written subscription agreement with **Hong Davis** under the guise of an investment into Ascend.  The agreement represented that "The Subscriber has not been encouraged to invest or not invest based on potential referrals to the Company or its affiliates, no person has asked any questions regarding the potential to refer patients to the Company and there is no requirement or expectation that referrals be made to the Company or its affiliates." These were false statements as the subscribers were encouraged to invest based upon potential referrals to the Company or its affiliates; subscribers were asked questions

**Indictment – Page 51**

regarding the potential to refer patients to the Company; and there was an expectation or requirement that referrals be made to the Company or its affiliates.  According to the Confidential Offering Memorandum, the Class A Members of the Company agreed that they would not refer any federal payor patient to any of the Healthcare Providers which the Company contracts for Management Services.

121.   After agreeing to receive the Ascend kickbacks, **Davis** began referring to LRH for lab testing.  At times, **Davis** was paid through Hong Davis, M.D., P.A., for purported marketing and consulting services.

122.   **Hong Davis** provided **Christopher Roland Gonzales** with a purported "investment" check of $1,000, dated January 14, 2016, from her practice, Hong Davis, M.D., P.A., to Ascend MSO.  In the "For" line of the check, **Davis** confirmed that it was for the "Boston Heart Partnership."

123.   **Hong Davis** ordered BHD tests through LRH because of the money **Laura Spain Howard** and **Christopher Roland Gonzales** had offered her.

124.   After referring testing to LRH, **Hong Davis** repeatedly asked **Christopher Roland Gonzales** when she would be paid for her referrals.  In February 2016, **Davis** asked **Gonzales**, "Expecting time to receive the payment check?"  In April 2016, **Davis** asked **Gonzales**, "I trust you will have my check ready tomorrow?"  The following day, **Davis** complained to **Gonzales**, "it sound [sic] very fishy and not right, look like we send you all the samples, not only just to get nothing, but also lost $1,000."  **Davis** stated, "I really wish you and Laura [Howard] can tell me the truth, now, if you guys know it."  **Davis** complained, "I am not satisfied, I have not see [sic] a dime and I have already lost

$1,000!" **Davis** noted that "for 5 months no distribution, never heard of." Davis indicated that she did not need Individual 1 "to be how are you, fine, and you person. I just need him to show me the number!"

125.   On or about May 6, 2016, **Hong Davis** received a $5,000 check that **William Todd Hickman** authorized and signed on behalf of Ascend MSO.  About two weeks later, **Davis** received a $6,438 check that **Hickman** authorized and signed on behalf of Ascend MSO.  In 2016, as authorized by **Hickman**, Ascend MSO paid **Davis** $54,871 for her referrals to LRH, a 5,387% return on investment.

126.   On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **William Todd Hickman, Christopher Roland Gonzales, Laura Spain Howard**, Individual 1, and others, acting through Ascend, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Hong Davis** through Hong Davis, M.D., P.A., to induce the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Hong Davis** acting through Hong Davis, M.D., P.A., knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for the ordering of any service and item

for which payment may be made in whole and in part under a Federal health care
program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 5/6/2016 | $5,000.00 | Hong Davis, M.D., P.A. |
| b. | 5/20/2016 | $6,438.84 | Hong Davis, M.D., P.A. |
| c. | 6/13/2016 | $7,780.00 | Hong Davis, M.D., P.A. |
| d. | 7/6/2016 | $6,826.00 | Hong Davis, M.D., P.A. |
| e. | 8/16/2016 | $2,333.00 | Hong Davis, M.D., P.A. |
| f. | 9/16/2016 | $5,293.00 | Hong Davis, M.D., P.A. |
| g. | 10/18/2016 | $8,774.00 | Hong Davis, M.D., P.A. |
| h. | 11/15/2016 | $8,446.00 | Hong Davis, M.D., P.A. |
| i. | 12/16/2016 | $3,980.00 | Hong Davis, M.D., P.A. |

**BenefitPro and Stamford**

127.    On or about February 11, 2016, Individual 1 had a conference call with
**Matthew John Theiler** and a BHD representative.  **Theiler** took notes and emailed the
notes to a BHD representative.

128.    On or about March 4, 2016, **Matthew John Theiler** met with Robert
Individual 1 in Beaumont, Texas.

129.    On or about June 2, 2016, BenefitPro, through **William Todd Hickman**
and Individual 1, entered into a written agreement with Stamford for the referral of and
arranging the furnishing and arranging for and recommending the ordering of health care
business for which payment may be made in whole or in part under Federal health care
programs.  BenefitPro acted as a recruiter for Stamford.  According to the agreement,
BenefitPro would receive 25% of net collections received by Stamford for BenefitPro-
generated referrals.  BenefitPro, in turn, paid physicians for the referral of and arranging

for and ordering and recommending the ordering of health care business for which payment may be made in whole or in part under Federal health care programs.

130. On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, Stamford knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to BenefitPro to induce the referral of and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the arranging for or recommending the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **William Todd Hickman**, Individual 1, and others, acting through BenefitPro, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for arranging for and recommending the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| l. | 11/14/2016 | $350,000.00 | BenefitPro |
| m. | 12/19/2016 | $15,000.00 | BenefitPro |
| n. | 12/19/2016 | $95,000.00 | BenefitPro |
| o. | 12/19/2016 | $96,000.00 | BenefitPro |
| p. | 12/19/2016 | $97,000.00 | BenefitPro |
| q. | 12/19/2016 | $98,000.00 | BenefitPro |
| r. | 12/19/2016 | $99,000.00 | BenefitPro |

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| s. | 1/5/2017 | $700,000.00 | BenefitPro |
| t. | 2/3/2017 | $800,000.00 | BenefitPro |
| u. | 3/9/2017 | $500,000.00 | BenefitPro |
| v. | 4/4/2017 | $500,000.00 | BenefitPro |
| w. | 5/2/2017 | $500,000.00 | BenefitPro |
| x. | 5/25/2017 | $100,000.00 | BenefitPro |
| y. | 6/2/2017 | $600,000.00 | BenefitPro |
| z. | 7/3/2017 | $600,000.00 | BenefitPro |
| aa. | 8/2/2017 | $600,000.00 | BenefitPro |
| bb. | 9/5/2017 | $600,000.00 | BenefitPro |
| cc. | 10/4/2017 | $600,000.00 | BenefitPro |
| dd. | 11/8/2017 | $200,000.00 | BenefitPro |

**Eridanus**

**Elizabeth Ruth Seymour**

131.    On or about August 1, 2016, BenefitPro entered into a written subscription agreement with **Elizabeth Ruth Seymour** under the guise of an investment into Eridanus.  The agreement represented that "The Subscriber has not been encouraged to invest or not invest based on potential referrals to the Company or its affiliates, no person has asked any questions regarding the potential to refer patients to the Company and there is no requirement or expectation that referrals be made to the Company or its affiliates." These were false statements as the subscribers were encouraged to invest based upon potential referrals to the Company or its affiliates; subscribers were asked questions regarding the potential to refer patients to the Company; and there was an expectation or requirement that referrals be made to the Company or its affiliates.  According to the Confidential Offering Memorandum, the Class A Members of the Company agreed that

**Indictment – Page 56**

they would not refer any federal payor patient to any of the Healthcare Providers which the Company contracts for Management Services.

132.    After agreeing to receive the BenefitPro kickbacks, **Seymour** began referring to Stamford for lab testing.  At times, **Seymour** was paid for purported marketing and consulting services.

133.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **William Todd Hickman, Christopher Roland Gonzales, Laura Spain Howard**, Individual 1, and others, acting through BenefitPro, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Elizabeth Ruth Seymour** to induce the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Elizabeth Ruth Seymour** knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 11/23/2016 | $15,000.00 | Elizabeth Seymour |
| b. | 12/22/2016 | $18,000.00 | Elizabeth Seymour |
| c. | 1/11/2017 | $23,000.00 | Elizabeth Seymour |

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| d. | 2/9/2017 | $26,400.00 | Elizabeth Seymour |
| e. | 3/21/2017 | $27,500.00 | Elizabeth Seymour |
| f. | 4/20/2017 | $16,317.90 | Elizabeth Seymour |
| g. | 5/25/2017 | $15,367.51 | Elizabeth Seymour |
| h. | 6/14/2017 | $21,317.90 | Elizabeth Seymour |
| i. | 7/12/2017 | $18,661.92 | Elizabeth Seymour |
| j. | 8/23/2017 | $17,961.40 | Elizabeth Seymour |
| k. | 9/18/2017 | $15,538.68 | Elizabeth Seymour |
| l. | 10/23/2017 | $9,704.28 | Elizabeth Seymour |
| m. | 1/9/2018 | $7,545.36 | Elizabeth Seymour |

**Geminorium**

**Balinh**

134.    On or about September 18, 2016, BenefitPro entered into a written subscription agreement with **Linh Ba Nguyen** and **Thuy Ngoc Nguyen** through Balinh under the guise of an investment into Geminorium.  The agreement represented that "The Subscriber has not been encouraged to invest or not invest based on potential referrals to the Company or its affiliates, no person has asked any questions regarding the potential to refer patients to the Company and there is no requirement or expectation that referrals be made to the Company or its affiliates."   These were false statements as the subscribers were encouraged to invest based upon potential referrals to the Company or its affiliates; subscribers were asked questions regarding the potential to refer patients to the Company; and there was an expectation or requirement that referrals be made to the Company or its affiliates.  According to the Confidential Offering Memorandum, the Class A Members of the Company agreed that they would not refer any federal payor patient to any of the Healthcare Providers which the Company contracts for Management Services.

135.    After agreeing to receive the BenefitPro kickbacks, **Linh Ba Nguyen** and **Thuy Ngoc Nguyen** began referring to Stamford for lab testing.  At times, **Linh Ba Nguyen** and **Thuy Ngoc Nguyen** were paid through Balinh for purported marketing and consulting services.

136.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **William Todd Hickman, Christopher Roland Gonzales, Laura Spain Howard**, Individual 1, and others, acting through BenefitPro, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Linh Ba Nguyen** and **Thuy Ngoc Nguyen**, through Balinh, to induce the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Linh Ba Nguyen** and **Thuy Ngoc Nguyen**, acting through Balinh, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|-----------|-------------|--------|-------------------|
| a. | 11/23/2016 | $6,000.00 | Balinh Inc. |
| b. | 12/22/2016 | $6,000.00 | Balinh Inc. |
| c. | 1/17/2017 | $10,000.00 | Balinh Inc. |

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| d. | 2/9/2017 | $9,200.00 | Balinh Inc. |
| e. | 3/21/2017 | $12,500.00 | Balinh Inc. |
| f. | 4/20/2017 | $5,377.12 | Balinh Inc. |
| g. | 5/25/2017 | $10,923.53 | Balinh Inc. |
| h. | 6/14/2017 | $11,377.12 | Balinh Inc. |
| i. | 7/12/2017 | $12,773.92 | Balinh Inc. |
| j. | 8/23/2017 | $6,513.16 | Balinh Inc. |

**Herculis**

**Joseph Gil Bolin**

137.    On or about September 13, 2016, BenefitPro entered into a written subscription agreement with **Joseph Gil Bolin** under the guise of an investment into Herculis.  The agreement represented that "The Subscriber has not been encouraged to invest or not invest based on potential referrals to the Company or its affiliates, no person has asked any questions regarding the potential to refer patients to the Company and there is no requirement or expectation that referrals be made to the Company or its affiliates." These were false statements as the subscribers were encouraged to invest based upon potential referrals to the Company or its affiliates; subscribers were asked questions regarding the potential to refer patients to the Company; and there was an expectation or requirement that referrals be made to the Company or its affiliates.  According to the Confidential Offering Memorandum, the Class A Members of the Company agreed that they would not refer any federal payor patient to any of the Healthcare Providers which the Company contracts for Management Services.

138.    After agreeing to receive the BenefitPro kickbacks, **Bolin** began referring to Stamford for lab testing.  At times, **Bolin** was paid for purported marketing and consulting services.

139.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **William Todd Hickman, Christopher Roland Gonzales, Laura Spain Howard**, Individual 1, and others, acting through BenefitPro, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Joseph Gil Bolin** to induce the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Joseph Gil Bolin** knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 11/23/2016 | $1,000.00 | Joseph Bolin M.D. |
| b. | 12/22/2016 | $2,200.00 | Joseph Bolin M.D. |
| c. | 1/17/2017 | $4,500.00 | Joseph Bolin M.D. |
| d. | 2/9/2017 | $3,000.00 | Joseph Bolin M.D. |
| e. | 3/21/2017 | $5,200.00 | Joseph Bolin M.D. |
| f. | 4/20/2017 | $2,422.32 | Joseph Bolin M.D. |
| g. | 5/25/2017 | $3,745.54 | Joseph Bolin M.D. |

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| h. | 6/14/2017 | $4,732.68 | Joseph Bolin M.D. |
| i. | 7/12/2017 | $4,544.56 | Joseph Bolin M.D. |
| j. | 8/23/2017 | $2,119.52 | Joseph Bolin M.D. |
| k. | 9/18/2017 | $3,913.80 | Joseph Bolin M.D. |
| l. | 10/23/2017 | $1,468.92 | Joseph Bolin M.D. |

**Heriberto Salinas**

140.    On or about September 21, 2016, BenefitPro entered into a written subscription agreement with **Heriberto Salinas** under the guise of an investment into Herculis.  The agreement represented that "The Subscriber has not been encouraged to invest or not invest based on potential referrals to the Company or its affiliates, no person has asked any questions regarding the potential to refer patients to the Company and there is no requirement or expectation that referrals be made to the Company or its affiliates." These were false statements as the subscribers were encouraged to invest based upon potential referrals to the Company or its affiliates; subscribers were asked questions regarding the potential to refer patients to the Company; and there was an expectation or requirement that referrals be made to the Company or its affiliates.  According to the Confidential Offering Memorandum, the Class A Members of the Company agreed that they would not refer any federal payor patient to any of the Healthcare Providers which the Company contracts for Management Services.

141.    After agreeing to receive the BenefitPro kickbacks, **Salinas** began referring to Stamford for lab testing.  At times, **Salinas** was paid through Heriberto Salinas, M.D., P.A., for purported marketing and consulting services.

**Indictment – Page 62**

142.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **William Todd Hickman, Christopher Roland Gonzales, Laura Spain Howard**, Individual 1, and others, acting through BenefitPro, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Heriberto Salinas** through Heriberto Salinas, M.D., P.A., to induce the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Heriberto Salinas**, acting through Heriberto Salinas, M.D., P.A., knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 11/23/2016 | $1,000.00 | Heriberto Salinas, M.D., P.A. |
| b. | 12/22/2016 | $2,200.00 | Heriberto Salinas, M.D., P.A. |
| c. | 1/17/2017 | $4,500.00 | Heriberto Salinas, M.D., P.A. |
| d. | 2/9/2017 | $3,000.00 | Heriberto Salinas, M.D., P.A. |
| e. | 3/21/2017 | $5,200.00 | Heriberto Salinas, M.D., P.A. |
| f. | 4/20/2017 | $2,422.32 | Heriberto Salinas, M.D., P.A. |
| g. | 5/31/2017 | $1,000.00 | Heriberto Salinas, M.D., P.A. |

**Hong Davis**

143.   On or about September 15, 2016, BenefitPro entered into a written subscription agreement with **Hong Davis** under the guise of an investment into Herculis. The agreement represented that "The Subscriber has not been encouraged to invest or not invest based on potential referrals to the Company or its affiliates, no person has asked any questions regarding the potential to refer patients to the Company and there is no requirement or expectation that referrals be made to the Company or its affiliates." These were false statements as the subscribers were encouraged to invest based upon potential referrals to the Company or its affiliates; subscribers were asked questions regarding the potential to refer patients to the Company; and there was an expectation or requirement that referrals be made to the Company or its affiliates.  According to the Confidential Offering Memorandum, the Class A Members of the Company agreed that they would not refer any federal payor patient to any of the Healthcare Providers which the Company contracts for Management Services.

144.   After agreeing to receive the BenefitPro kickbacks, **Davis** began referring to Stamford for lab testing.  At times, **Davis** was paid through Hong Davis, M.D., P.A., for purported marketing and consulting services.

145.   On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, **William Todd Hickman, Christopher Roland Gonzales, Laura Spain Howard**, Individual 1, and others, acting through BenefitPro, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to **Hong**

**Davis** through Hong Davis, M.D., P.A., to induce the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Hong Davis** acting through Hong Davis, M.D., P.A., knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|-----------|--------------|--------|-------------------|
| a. | 11/23/2016 | $1,000.00 | Hong Davis, M.D., P.A. |
| b. | 12/22/2016 | $2,200.00 | Hong Davis, M.D., P.A. |
| c. | 1/17/2017 | $4,500.00 | Hong Davis, M.D., P.A. |
| d. | 2/9/2017 | $3,000.00 | Hong Davis, M.D., P.A. |
| e. | 3/21/2017 | $5,200.00 | Hong Davis, M.D., P.A. |

**BenefitPro and Regal**

146.   In or around November 2016, Regal, through **Ruben Daniel Marioni** and **Jordan Joseph Perkins**, entered into an agreement with BenefitPro, through **William Todd Hickman** and Individual 1, for the referral of and arranging the furnishing and arranging for and recommending the ordering of health care business for which payment may be made in whole or in part under Federal health care programs.  Regal acted as a recruiter for Stamford.  According to the agreement, Regal, paid physicians for the referral of and arranging for and ordering and recommending the ordering of health care

business for which payment may be made in whole or in part under Federal health care programs.  Stamford, in turn, would make payments to BenefitPro on behalf of Regal for the referral of and arranging the furnishing and arranging for and recommending the ordering of health care business for which payment may be made in whole or in part under Federal health care programs.  BenefitPro, in turn, would make payments to Regal on behalf of Stamford.

147.    On or about the dates specified below in the payment date column, to the particular entity or individual specified, and in the amounts specified, BenefitPro, through **William Todd Hickman** and Individual 1, on behalf of Stamford, knowingly and willfully paid remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, to Regal to induce the referral of and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program and to induce the arranging for or recommending the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program; and **Ruben Daniel Marioni** and **Jordan Joseph Perkins**, acting through Regal, knowingly and willfully received remuneration, including any kickback, directly and indirectly, overtly and covertly, in cash and in kind, in return for the referral of and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program and in return for arranging for and recommending the ordering of any service and item for which payment may be made in whole and in part under a Federal health care program.

| Overt Act | Payment Date | Amount | Entity/Individual |
|---|---|---|---|
| a. | 2/9/2017 | $25,000.00 | Regal Health Solutions LLC |
| b. | 3/21/2017 | $50,000.00 | Regal Health Solutions LLC |
| c. | 4/20/2017 | $101,541.36 | Regal Health Solutions LLC |
| d. | 5/25/2017 | $81,367.77 | Regal Health Solutions LLC |
| e. | 6/14/2017 | $118,701.80 | Regal Health Solutions LLC |
| f. | 7/12/2017 | $101,959.60 | Regal Health Solutions LLC |
| g. | 8/23/2017 | $81,866.41 | Regal Health Solutions LLC |
| h. | 9/26/2017 | $124,895.79 | Regal Health Solutions LLC |
| i. | 10/23/2017 | $66,025.50 | Regal Health Solutions LLC |

All in violation of 18 U.S.C. § 371.

## NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE
### Pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c)

1.      The allegations contained in Count 1 this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants have an interest.

2.      Upon conviction of any violation of 18 U.S.C. § 371, the defendants, **Susan L. Hertzberg, Matthew John Theiler, David Weldon Kraus, Jeffrey Paul Parnell, Thomas Gray Hardaway, Laura Spain Howard, Jeffrey Paul Madison, Todd Dean Cook, William Todd Hickman, Christopher Roland Gonzales, Ruben Daniel Marioni, Jordan Joseph Perkins, Elizabeth Ruth Seymour, Linh Ba Nguyen, Thuy Ngoc Nguyen, Joseph Gil Bolin, Heriberto Salinas,** and **Hong Davis,** shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity," pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

3.      Upon conviction of any Federal health care offense, the defendants, **Susan L. Hertzberg, Matthew John Theiler, David Weldon Kraus, Jeffrey Paul Parnell, Thomas Gray Hardaway, Laura Spain Howard, Jeffrey Paul Madison, Todd Dean Cook, William Todd Hickman, Christopher Roland Gonzales, Ruben Daniel Marioni, Jordan Joseph Perkins, Elizabeth Ruth Seymour, Linh Ba Nguyen, Thuy Ngoc Nguyen, Joseph Gil Bolin, Heriberto Salinas,** and **Hong Davis,** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or

indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7).

4.    The property which is subject to forfeiture, includes but is not limited to the following:

Cash Proceeds:

A sum of money equal to $11,256,241.68 in United States currency, and all interest and proceeds traceable thereto, representing the proceeds of the offense, for which the defendants are personally liable.

5.    Pursuant to 21 U.S.C. § 853(p), as incorporated by reference by 18 U.S.C. § 982(b), if any of the forfeitable property, or any portion thereof, as a result of any act or omission of the defendant:

a.    Cannot be located upon the exercise of due diligence;

b.    Has been transferred, or sold to, or deposited with a third party;

c.    Has been placed beyond the jurisdiction of the Court;

d.    Has been substantially diminished in value; or

e.    Has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States to seek the forfeiture of other property of the defendant up to the value of the above-described forfeitable properties, including, but not limited to, any identifiable property in the name of the defendants, **Susan L. Hertzberg, Matthew John Theiler, David Weldon Kraus, Jeffrey Paul Parnell, Thomas Gray Hardaway, Laura Spain Howard, Jeffrey Paul Madison, Todd Dean Cook, William Todd Hickman, Christopher Roland Gonzales, Ruben Daniel Marioni, Jordan Joseph**

Indictment – Page 69

**Perkins**, **Elizabeth Ruth Seymour**, **Linh Ba Nguyen**, **Thuy Ngoc Nguyen**, **Joseph Gil Bolin**, **Heriberto Salinas**, and **Hong Davis**.

6.      By virtue of the commission of the offenses alleged in this Indictment, any and all interest the defendants have in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c).

All pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982(a)(7), and 28 U.S.C. § 2461(c) and the procedures set forth at 21 U.S.C. § 853, as made applicable through 18 U.S.C. § 982(b)(1).

A TRUE BILL

1-12-22
_____
Date

_____
GRAND JURY FOREPERSON

BRIT FEATHERSTON
UNITED STATES ATTORNEY

_____
NATHANIEL C. KUMMERFELD
ASSISTANT UNITED STATES ATTORNEY

Indictment – Page 70

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | No. 6:22-CR-___ |
| v. | § | JUDGE |
| | § | |
| SUSAN L. HERTZBERG (01) | § | **UNDER SEAL** |
| MATTHEW JOHN THEILER (02) | § | |
| DAVID WELDON KRAUS (03) | § | |
| JEFFREY PAUL PARNELL (04) | § | |
| THOMAS GRAY HARDAWAY (05) | § | |
| LAURA SPAIN HOWARD (06) | § | |
| JEFFREY PAUL MADISON (07) | § | |
| TODD DEAN COOK (08) | § | |
| WILLIAM TODD HICKMAN (09) | § | |
| CHRISTOPHER ROLAND | § | |
| GONZALES (10) | § | |
| RUBEN DANIEL MARIONI (11) | § | |
| JORDAN JOSEPH PERKINS (12) | § | |
| ELIZABETH RUTH SEYMOUR (13) | § | |
| LINH BA NGUYEN (14) | § | |
| THUY NGOC NGUYEN (15) | § | |
| JOSEPH GIL BOLIN (16) | § | |
| HERIBERTO SALINAS (17) | § | |
| HONG DAVIS (18) | § | |

## NOTICE OF PENALTY

## COUNT 1

VIOLATION:    18 U.S.C. § 371
              Conspiracy to Commit Illegal Remunerations

PENALTY:      Imprisonment of not more than five (5) years; the greater of a
              fine not to exceed $250,000, a fine not to exceed two times
              the gross gain to the Defendant, or a fine not to exceed two
              times the loss to the victim, or both such imprisonment and
              fine; and a term of supervised release of not more than three
              (3) years.

SPECIAL ASSESSMENT: $100.00