## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 6:22-cr-003-JDK-JDL |
| | § | |
| SUSAN L. HERTZBERG, et al. | § | |
| | § | |

## ORDER DENYING MOTIONS TO SEVER

In this case, eighteen defendants are charged with conspiracy to commit illegal remunerations, in violation of 18 U.S.C. § 371.  Docket No. 1, Count One, ¶ 2.  The case is set for trial on October 16, 2023.  Six defendants now move to sever their trials from that of their codefendants.   Docket Nos. 394 (Susan Hertzberg), 397 (joint motion of Defendants Jeffrey Madison and Todd Cook), 399 (Thomas Hardaway), 437 (David Kraus), 454 (Matthew Theiler).

As explained below, Defendants fail to show that prejudice outweighs the interest in conducting a joint trial.  Accordingly, the Court **DENIES** the motions to sever.

## I.

On January 12, 2022, the grand jury indicted eighteen defendants for their alleged participation in a healthcare kickback conspiracy.  Docket No. 1.  The indictment alleges a single, two-and-a-half-year conspiracy during which two rural Texas hospitals paid kickbacks to providers through managed service organizations ("MSOs") to induce referrals for laboratory tests later reimbursed by federal payors.

1

The two hospitals, Little River Healthcare ("Little River") and Stamford Memorial Hospital ("Stamford"), are classified as "Critical Access Hospitals,"[1] which means they are eligible for favorable federal healthcare program reimbursements for services performed for their patients.

According to the indictment, in 2015, Little River and its officers, Defendants Jeffrey Madison and Todd Cook, "implemented a plan to defraud federal healthcare programs by funneling claims for ancillary services, including laboratory tests, for hospital non-patients through [Little River] for higher reimbursement." *Id.*, Count One, ¶ 10. Madison and Cook allegedly agreed with Boston Heart Diagnostics, which offers laboratory services, "to bill healthcare programs for laboratory testing performed by [Boston Heart]." *Id.* ¶ 11. Madison and Cook also agreed "to pay recruiters to arrange for and recommend to providers throughout Texas laboratory testing through [Little River] for beneficiaries who were neither [Little River] inpatients nor [Little River] outpatients." *Id.* Little River's "claims to federal healthcare programs for laboratory testing falsely represented that the tests were for [Little River] outpatients, when in fact the beneficiaries were not patients of [Little River]," "were more than 100 miles away from [Little River], and had never heard of the hospital, much less been a patient there." *Id.* ¶¶ 13–14.

---

[1] Hospitals may be classified as Critical Access Hospitals if they have 25 or fewer inpatient beds, provide emergency services 24 hours per day, and are located in underserved rural areas some distance from other hospitals.   42 C.F.R. §§ 485.610, 485.618, 485.620.   These Critical Access Hospitals receive Medicare reimbursements that are generally much higher than the predetermined rates that Medicare pays other hospitals.

To induce referrals, Madison and Cook allegedly "agreed to pay thousands of dollars to providers who referred to [Little River]." *Id.* ¶ 16. Madison, on behalf of Little River, "agreed to pay per-test fees to [Boston Heart] to run blood tests for [Little River]." *Id.* ¶ 18. To gain referrals, Little River paid recruiters to approach providers and persuade them to order blood testing through the hospital. *Id.* The recruiters then "kicked back some of those payments to the referring [providers], while disguising the payments . . . as investment distributions from an MSO." *Id.* The providers ordered Boston Heart testing from Little River; Little River billed for the tests to federal healthcare programs as outpatient services; and then Little River paid Boston Heart and recruiters as agreed. *Id.* ¶¶ 17–18. According to the indictment, Madison and Cook understood and agreed with the MSO kickback scheme. *Id.*

Based on the success of the Little River–Boston Heart arrangement, certain Defendants and co-conspirators allegedly "agreed to continue the MSO kickback scheme with another Texas hospital," and eventually reached an agreement with Stamford in early 2016. *Id.* ¶¶ 65–70. The indictment alleges that Stamford, like Little River, paid providers, "while disguising the payments as purported MSO investment distributions," to refer patients for laboratory testing by Stamford using Boston Heart. *Id.* ¶¶ 78–80.

The indictment further alleges that Boston Heart executives "knew that the individuals receiving [Boston Heart] testing through [Little River] were neither inpatients nor outpatients" of the hospital. *Id.* ¶ 43. Similarly, the Boston Heart executives knew that the kickback payments to providers through MSOs drove blood

testing referrals to Stamford.  *Id.*  ¶ 86.  Further, Boston Heart personnel allegedly "participated with the MSOs in sales pitches to offer [doctors] money to induce their referrals and orders."  *Id.* ¶ 45.

Defendants include providers, MSO personnel, and executives from Little River and Boston Heart.  Six of these defendants now move to sever their trials under Federal Rule of Criminal Procedure 14.  Docket Nos. 394, 397, 399, 437, 454.

## II.

As a general matter, "persons indicted together should be tried together, especially in conspiracy cases."  *United States v. Hankton*, 51 F.4th 578, 608 (5th Cir. 2022).  Indeed, Rule 8(b) permits the joinder of multiple defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  FED. R. CRIM. P. 8(b).

Rule 14, however, allows for severance of joined defendants "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government . . . ."  FED. R. CRIM. P. 14(a).  Fifth Circuit caselaw "does not reflect a liberal attitude toward severance."  *United States v. Ledezma-Cepeda*, 894 F.3d 686, 690 (5th Cir. 2018).  Severance is an exception to the general rule of joinder, *United States v. McRae*, 702 F.3d 806, 821 (5th Cir. 2012), warranted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  This presumption stems from the belief that joint trials "promote efficiency" and protect against the "inequity

of inconsistent verdicts." *Ledezma-Cepeda*, 894 F.3d at 690 (quoting *Zafiro*, 506 U.S. at 537).

"To surmount this heavy presumption, a defendant must show that '(1) the joint trial prejudice[s] him to such an extent that the district court [can]not provide adequate protection; and (2) the prejudice outweigh[s] the government's interest in economy of judicial administration.'" *Id.* (quoting *United States v. Owens*, 683 F.3d 93, 98 (5th Cir. 2012)). "Generic allegations of prejudice will not suffice . . . ." *Id.* A defendant must show a "specific compelling prejudice" resulting from joinder. *United States v. Lewis*, 476 F.3d 369, 383 (5th Cir. 2007); *see also United States v. Hamilton*, 694 F.2d 398, 401 (5th Cir. 1982) ("[T]he defendant bears a heavy burden of showing specific and compelling prejudice."); *United States v. Park*, 531 F.2d 754, 762 (5th Cir. 1976) ("The burden of demonstrating prejudice is a difficult one . . . . The defendant must show something more than the fact that a separate trial might offer him a better chance of acquittal.").

Further, in conspiracy cases, the Fifth Circuit "generally favor[s] specific instructions over severance." *Ledezma-Cepeda*, 894 F.3d at 690. "That is because it is generally presumed that juries follow the instructions given to them by the district court and are capable of compartmentalizing the evidence against each defendant." *Id.* (cleaned up). Even when the evidence in a case is "both massive and complex," the court can "explicitly instruct[] the jury to consider each offense separately and each defendant individually." *United States v. Whitfield*, 590 F.3d 325, 356 (5th

Cir. 2009).  "Limiting instructions such as these are generally sufficient to prevent the threat of prejudice resulting from unsevered trials."  *Id.*

### III.

As noted above, Defendants Susan Hertzberg, Matthew Theiler, David Kraus, and Thomas Hardaway have each filed individual motions to sever.  Defendants Jeffrey Madison and Todd Cook jointly move to sever.  The Court addresses each motion in turn below.

### A.    Susan Hertzberg

Defendant Susan Hertzberg is the former chief executive officer of Boston Heart.  She asks for a trial against her alone, or alternatively, against her and codefendant Matthew Theiler.  Docket No. 394 at 1.  She argues that a trial with all defendants will result in (1) "substantial spillover prejudice" to her, and (2) her defenses will be "antagonistic" to those of her codefendants.  *Id.* at 9–15.  She concludes (3) this prejudice outweighs the interests of judicial economy, warranting severance.  *Id.* at 15.  These arguments are without merit.

### 1.

Regarding spillover prejudice, Hertzberg contends that her alleged role in this conspiracy was minimal compared to the roles of her codefendants.  *Id.* at 10.  She also argues that certain evidence—specifically, the testimony of her codefendants and evidence of the Stamford scheme—would be inadmissible against her, and its admission in her trial would be prejudicial.  *Id.* at 10–11.  The Government responds that these concerns are insufficient to justify severance and that a limiting

instruction will remedy any concerns.  Docket No. 499 at 8.  The Court agrees with the Government.

"A spillover effect, by itself, is an insufficient predicate for a motion to sever." *United States v. Bieganowski*, 313 F.3d 264, 287 (5th Cir. 2002).  For this reason, the Fifth Circuit routinely affirms the denial of severance motions where, as here, the defendant complains "broadly of the volume of evidence, the disparity of evidence between defendants, and a generalized spillover effect, but [does] not point to any specific prejudice resulting from his combined trial."  *See, e.g.*, *United States v. Stalnaker*, 571 F.3d 428, 435 (5th Cir. 2009) (cleaned up).  Even if Hertzberg is correct that she had no role in the Stamford scheme, she fails to identify "what specific prejudice will transpire" in a trial with her codefendants.  *United States v. Chapman*, 851 F.3d 363, 380 (5th Cir. 2017) (rejecting spillover argument where the defendant "merely complain[ed] that the sheer volume of evidence relating to his co-defendants . . . confused the jurors").

The Court can instruct the jury not to consider the Stamford-related evidence against Hertzberg if she presents evidence at trial that she left Boston Heart before the company reached an agreement with Stamford.  *See* DIST. JUDGES ASS'N FIFTH CIR., PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) § 1.24 (2019) (instruction on considering separately and individually the case against each defendant).  Other courts have followed this path.  *See, e.g., United States v. USPlabs, LLC*, 2018 WL 5831478, at *7 (N.D. Tex. Nov. 7, 2018) (denying severance where the defendant argued he had a "limited role" and the jury would "have difficulty separating him

from other people's statements and actions" because the court could instruct the jury to consider only the evidence against the moving defendant).

Further, the Supreme Court recently reaffirmed the ability of the Government to introduce codefendant testimony in joint trials, so long as certain safeguards like redactions are used and the jury is instructed to consider the confession only with respect to the confessing codefendant. *Samia v. United States*, 143 S. Ct. 2004, 2017 (2023) (affirming conviction where the district court admitted a redacted version of testimony and issued a limiting instruction to the jury). Hertzberg acknowledges this case but argues that "it asks a lot of a jury to keep so many admissions straight." Docket No. 394 at 11. In its response, the Government notes the ameliorative measures identified in *Samia*, and appears willing to abide by this recent Supreme Court guidance. Docket No. 499 at 8. It is "generally presumed," moreover, "that juries follow the instructions given to them." *Ledezma-Cepeda*, 894 F.3d at 690. There is no indication that these safeguards would be ineffective here.

## 2.

Hertzberg also contends severance is necessary because her codefendants are likely to present "conflicting defenses that a jury could not fairly evaluate at the same time." Docket No. 394 at 12. She elaborates:

> to the extent the government introduces evidence that the [Boston Heart] sales representative defendants knowingly engaged in a kickback scheme, Ms. Hertzberg intends to establish that those sales representatives were actively concealing their conduct from her and the rest of [Boston Heart's] leadership. . . . Ms. Hertzberg expects to argue that her co-defendants' participation in the alleged conspiracy and their concealment of key facts about Little River and the MSOs go hand in hand—in other words, that their guilt tends to establish her own

innocence.  We expect that the co-defendants in turn will seek to rebut or undermine that argument.

*Id.* at 13.  The Government responds that these are not antagonistic defenses.  Docket No. 499 at 9–11.  Again, the Court agrees.

Incompatible defenses by codefendants may require severance if the defenses are "antagonistic to the point of being mutually exclusive or irreconcilable," so that "the jury, in order to believe the core of one defense, *must necessarily disbelieve* the core of the other."  *United States v. Sandoval*, 847 F.2d 179, 183 (5th Cir. 1988) (emphasis added); *see also United States v. Holcomb*, 797 F.2d 1320, 1324 (5th Cir. 1986) ("Antagonistic defenses . . . do not result solely when each defendant points the finger at the other.").  "The conflict must concern the core or essence of a defense, not merely minor or peripheral matters."  *United States v. Daniels*, 281 F.3d 168, 177 (5th Cir. 2002) (cleaned up).  Even where they are present, moreover, "[m]utually antagonistic defenses are not prejudicial per se."  *Zafiro*, 506 U.S. at 539.

Here, the defenses identified by Hertzberg are not antagonistic.  The "core" of Hertzberg's defense is her lack of knowledge.  Docket No. 394 at 12; *United States v. Macias*, 2009 WL 508719, at *3 (N.D. Tex. Mar. 2, 2009) (finding the "core" of the defendant's defense was lack of knowledge and innocence); *United States v. Nunez*, 2016 WL 3167657, at *3 (E.D. La. June 7, 2016) (describing the "core" of a complicated factual defense as a lack of knowledge).  The jury can believe that Hertzberg lacked knowledge and also believe that her codefendants are innocent of the alleged conspiracy. *United States v. Abdallah*, 2007 WL 3256261, at *5 (S.D. Tex. Nov. 5, 2007) (holding that (1) a lack-of-knowledge defense predicated on

codefendants' allegedly "with[holding] information about [a company's] fraudulent activities" and (2) a lack-of-fraudulent activity defense were not antagonistic because, "although the defenses are inconsistent, they are not irreconcilable"); *Macias*, 2009 WL 508719, at *3 (denying motion to sever where the jury did not need to believe the codefendants acted criminally to find the moving defendant lacked knowledge).  In other words, it is not "necessary" for the jury to find Hertzberg's codefendants guilty to find that she lacked knowledge. *McGraw v. Lynn*, 990 F.2d 625, 626 (5th Cir. 1993) (per curiam) ("[B]ecause the jury, in order to believe Manchester's defenses of lack of intent and non-involvement, need not have disbelieved McGraw's defense of non-involvement, the co-defendants' defenses were not so irreconcilable to warrant severance."); *cf. United States v. Crawford*, 581 F.2d 489, 491–92 (5th Cir. 1978) (holding that severance should have been granted where an illegal weapon was found in a vehicle and the driver and passenger were tried together for possession of the weapon because each asserted that the other owned the gun).  The defenses, then, are not antagonistic. *Macias*, 2009 WL 508719, at *3 (denying motion to sever because "the guilt of [the moving defendant's] co-defendants does not *necessarily* establish [his] innocence").

Hertzberg also argues that a joint trial will require the Court to choose between "limiting [her Fifth Amendment] right to present effective argument to the jury and her co-defendants' constitutional rights."  Docket No. 394 at 14.  Specifically, she contends that if the Little River Defendants do not testify, her counsel "may seek to point out to the jury that, as it considers the competing defenses, it should consider

that" her theory has the benefit of defendant testimony, while theirs does not.  *Id.*
Hertzberg cites a single case to support her argument, *De Luna v. United States*, 308
F.2d 140 (5th Cir. 1962).  But as she acknowledges, *De Luna* and its progeny are
predicated on the existence of antagonistic defenses.  Docket No. 394 at 15 n.5.
Because Hertzberg has not identified antagonistic defenses here, this argument fails.
*See United States v. Wilson*, 451 F.2d 209, 215 (5th Cir. 1971) ("Since antagonistic
defenses were not present in this case, *De Luna* has no application.").

### 3.

Finally, Hertzberg argues that separate trials of the Texas Defendants and the
Massachusetts Defendants (i.e., Hertzberg and Theiler) will be judicially economical.
Docket No. 394 at 15.  It is unclear how.  Severance will require two or more trials in
which the Government must present overlapping, if not identical, evidence multiple
times.  Indeed, the very purpose of joining multiple defendants in a single trial is "to
avoid a multiplicity of trials."  *Zafiro*, 506 U.S. at 540.

*       *       *

Hertzberg has not shown "specific compelling prejudice" that warrants
severance.  *Lewis*, 476 F.3d at 383.  Thus, she has not shown that any prejudice
outweighs the interests of judicial economy in a joint trial.  *Crawford,* 581 F.2d at 491.
Accordingly, the Court **DENIES** Hertzberg's motion to sever (Docket No. 394).

### B.    Jeffrey Madison & Todd Cook

Defendants Jeffrey Madison and Todd Cook jointly move to sever, seeking a
trial against them alone.  Docket No. 397.  Madison previously served as the chief

executive officer of Little River, and Cook was the hospital's director of lab services. *Id.* at 2; Docket No. 1, Count One, ¶ 40. Together, they argue that severance is warranted here because (1) they have been improperly joined under Rule 8(b), (2) spillover prejudice will occur absent severance, and (3) their defenses are antagonistic to those of their codefendants. Docket No. 397 at 20. They conclude (4) this prejudice outweighs the interests of judicial economy, warranting severance. *Id.* at 15. As explained below, these arguments fail.

### 1.

Madison and Cook contend the indictment improperly joined "two distinct conspiracies" under Rule 8(b)—one involving Little River, and one involving Stamford. Docket No. 397 at 12–15.

The Court previously rejected this argument in denying a motion to dismiss the indictment. *See* Docket No. 615. As the Court explained, "it is well settled that a charge of conspiracy initially legitimizes joinder of all defendants." *Id.* (quoting *United States v. Elam*, 678 F.2d 1234, 1250 (5th Cir. 1982)). The Court further found that "the indictment does not violate Rule 8 because the Little River and Stamford schemes are unified by a 'substantial identity of facts or participants.'" *Id.* (quoting *United States v. McRae*, 702 F.3d 806, 820 (5th Cir. 2012)). And the indictment describes a "common goal" among the Defendants weighing in favor of joinder. *Id.* at 16–17.

Severance is therefore improper on this basis. *United States v. Potashnik*, 2008 WL 5272807, at *20 (N.D. Tex. Dec. 17, 2008) (denying motion to sever where the

"key goal" of several defendants was to "accept and/or extort bribes," even though not all defendants were involved in all transactions); *United States v. Thomas*, 12 F.3d 1350, 1357 (5th Cir. 1994) (upholding jury finding of one conspiracy because the defendants had a "common goal of distributing illegal drugs for profit," even though not all defendants were aware of all codefendants).

**2.**

Madison and Cook next contend they had "limited roles" compared to the evidence against their codefendants, which they summarize as "far more damning." Docket No. 397 at 15.  This evidence, they contend, will "influence" the jury's verdict against them.  *Id.* at 16.

This argument fails for the same reasons the Court rejected Hertzberg's spillover argument above.  *See supra* Section III.A.1.  It is generally insufficient "for a defendant to allege they were less involved than other defendants."  *United States v. Perry*, 35 F.4th 293, 343 (5th Cir. 2022).  Even if Madison and Cook prove they had no role in the Stamford scheme as they claim, they fail to identify "what specific prejudice will transpire" if they are tried with their codefendants.  *Chapman*, 851 F.3d at 380 (rejecting spillover argument where the defendant "merely complain[ed] that the sheer volume of evidence relating to his co-defendants . . . confused the jurors").  Instead, Madison and Cook dedicate much of their spillover argument to their belief that Stamford and Little River constitute separate conspiracies.  Docket No. 397 at 16–17.  It is thus unclear how Madison and Cook will face prejudice sufficient to warrant severance.  *USPlabs*, 2018 WL 5831478, at *7 (denying

severance where the defendant argued he had a "limited role" and the jury would "have difficulty separating him from other people's statements and actions" because the court could appropriately instruct the jury to address any concerns).

### 3.

Finally, Madison and Cook argue they and their codefendants will present mutually antagonistic defenses at trial. Specifically, Madison and Cook contend several codefendants concealed their illegal actions from them and they therefore had no knowledge of any illegality. Docket No. 397 at 18. Madison and Cook believe this defense is at odds with their codefendants' defense that Madison and Cook concealed their own illegal actions. *Id.* at 18–19.

Like Hertzberg, Madison and Cook fail to identify an antagonistic defense. *See supra* Section III.A.2. The core of their defense is a lack of knowledge. Docket No. 397 at 18. The jury can believe Madison and Cook lacked knowledge and also believe their codefendants are innocent. *Macias*, 2009 WL 508719, at *3 (denying motion to sever where the jury did not need to believe the codefendants acted criminally to find the moving defendant lacked knowledge); *see also Holcomb*, 797 F.2d at 1324 ("Antagonistic defenses . . . do not result solely when each defendant points the finger at the other.").

Madison and Cook also argue that a joint trial will inhibit their ability to assert the advice-of-counsel defense. Docket No. 397 at 19. They anticipate offering the testimony of lawyers who gave them advice on the alleged kickback scheme. *Id.* The problem, as Madison and Cook see it, is that their "co-defendants are expected to

assert they relied on claims by cooperating witnesses Robert O'Neal and Ruben Marioni" that the MSO operations were lawful. *Id.* Madison and Cook add that O'Neal has refused to waive attorney–client privilege, and Marioni is represented now by the same attorney who previously gave him advice. *Id.*

The Court is uncertain how O'Neal's refusal to waive privilege or Marioni's representation will inhibit Madison's and Cook's ability to call their own lawyers who advised them. *USPlabs*, 2018 WL 5831478, at *13 ("Willson has not presented the court with detailed information that would allow it to evaluate his advice-of-counsel defense or determine whether it might conflict with a Codefendants' defense."). The two cases cited by Madison and Cook, moreover, are distinguishable because the moving defendants in those cases sought to elicit the testimony of a *codefendant* lawyer. *See United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1148 (D. Mont. 2006); *United States v. Renzi*, 2010 WL 582100, at *10–11 (D. Ariz. Feb. 18, 2010).

### 4.

Finally, Madison and Cook argue that a "mega trial" is prejudicial and is not judicially economical. Docket No. 397 at 20–21. Specifically, they argue a large, multi-defendant trial will create logistical issues, limit the Court's ability to handle its docket, and burden the jury. *Id.* They conclude that the prejudice they have identified outweighs any interest in the judicial economy of a "mega trial." *Id.*

The Fifth Circuit "has rejected the notion that the length of trial or number of defendants or the atmosphere of a 'megatrial' alone can establish the compelling prejudice required for reversal based on the denial of a motion to sever." *United*

*States v. Posada-Rios*, 158 F.3d 832, 863 (5th Cir. 1998); *United States v. Ellender*, 947 F.2d 748, 753 (5th Cir. 1991) (affirming denial of motion to sever where twenty-one defendants were ultimately tried together in a three-month trial).  Here, moreover, all Defendants are charged in a single count with violating the same law, minimizing both the time required for trial and the burden on the jury of managing many permutations that occur in multi-count, multi-defendant trials.  *See, e.g.*, *United States v. DeLeon*, 2017 WL 3054511, at *96 (D.N.M. June 30, 2017) (granting motion to sever in a twenty-defendant, sixteen-count trial in part because of the complications imposed by multiple counts), *aff'd sub nom. United States v. Garcia*, 2023 WL 4341599 (10th Cir. July 5, 2023).  The severance sought by Madison and Cook, moreover, would require multiple trials in which the Government would be required to present overlapping, if not identical, evidence multiple times. *Zafiro*, 506 U.S. at 540 (joinder "avoid[s] a multiplicity of trials").

*   *   *

Madison and Cook have not shown "specific compelling prejudice" that warrants severance.[2]  *Lewis*, 476 F.3d at 383.  They have therefore failed to show that any prejudice outweighs the interests of judicial economy in a joint trial.

---

[2] Madison and Cook also argue that limiting instructions in this case will be ineffective.  *See* Docket No. 397 at 22–23.  It is unclear whether this is an independent argument for severance.  At any rate, the Court finds Madison and Cook's cited cases to be unpersuasive and factually distinguishable. *See, e.g.*, *United States v. Cortinas*, 142 F.3d 242, 248 (5th Cir. 1998) (reversing conviction because a limiting instruction was inadequate to mitigate prejudicial effects of "highly inflammatory evidence" of a shooting committed by a gang of which defendants were not members).  Indeed, it is "generally presumed that juries follow the instructions given to them."  *Ledezma-Cepeda*, 894 F.3d at 690.

*Crawford,* 581 F.2d at 491.   The Court **DENIES** their motion to sever (Docket No. 397).

### C.      Thomas Hardaway

Defendant Thomas Hardaway, a Texas-based, former Boston Heart sales representative, moves to sever his trial from that of ten codefendants he contends were primarily associated with the Stamford scheme.   Docket No. 399.   Hardaway argues that severance is appropriate here because (1) Defendants will raise mutually antagonistic defenses and (2) spillover prejudice is likely to occur through a joint trial with the Stamford Defendants.   *Id.* at 9–17.   Hardaway concludes that this prejudice (3) outweighs the interests of judicial economy. *Id.* at 17–18. As explained below, these arguments fail.

### 1.

Hardaway first argues that Defendants intend to present mutually antagonistic defenses at trial.   Specifically, Hardaway plans to argue that he was unaware of the terms of Little River's relationship with the MSOs, that Boston Heart management was responsible for resolving compliance concerns with Little River, and that he lacked knowledge that the MSOs operated unlawfully.   Docket No. 399 at 11.   Hardaway believes this defense is at odds with Hertzberg and Theiler's core defense that Hardaway and others concealed the scheme from them.   *Id.* at 11–12.

Like Hertzberg, Hardaway fails to identify antagonistic defenses.   *See supra* Section III.A.2.   The core of both Hardaway's and Hertzberg's defenses is a lack of knowledge of unlawful activity.   Docket No. 394 at 12 (Hertzberg); Docket No. 399

at 11 (Hardaway).   As explained above, the jury can believe Hardaway lacked knowledge and is therefore not guilty, and also believe that Hertzberg lacked knowledge. *United States v. Bynum*, 566 F.2d 914, 926 (5th Cir. 1978) (rejecting claim that severance was required because it was "not essential to [one defendant's] defense, that the jury find [another defendant] guilty of the substantive offenses."); *Macias*, 2009 WL 508719, at *3 (denying motion to sever where the jury did not need to believe the codefendants acted criminally to find the moving defendant lacked knowledge).

Hardaway also contends that a joint trial is likely to impact his Fifth Amendment rights due to the antagonistic defenses and the "likelihood that at least one of [the defendants]" will testify at trial.   Docket No. 399 at 12.   He cites *De Luna v. United States*, 308 F.2d 140 (5th Cir. 1962).   As noted above, *De Luna* and its progeny are predicated on the existence of an antagonistic defense.   *See supra* Section III.A.2.   Because Hardaway has not identified one here, this argument fails.

**2.**

Hardaway also argues that because he left Boston Heart before the company reached an arrangement with Stamford, he will suffer "spillover prejudice" from evidence regarding the Stamford Defendants.   Docket No. 399 at 13–17.

This argument fails for the same reasons the Court rejected Hertzberg's argument above.   *See supra* Section III.A.1.   "A spillover effect, by itself, is an insufficient predicate for a motion to sever." *Bieganowski*, 313 F.3d at 287.   Even if

Hardaway had no role in the Stamford scheme as he claims, Hardaway fails to identify "what specific prejudice will transpire." *Chapman*, 851 F.3d at 380.

3.

Finally, Hardaway argues that separate trials will be judicially economical. Docket No. 399 at 17–18. Hardaway claims that the number of defendants and length of the estimated trial establish prejudice, and separate trials will be more economical for the Court, Defendants, and the jurors. *Id.*

As explained above, the Court disagrees. *See supra* Section III.B.4; *see also Posada-Rios*, 158 F.3d at 863 ("[The Fifth Circuit] has rejected the notion that the length of trial or number of defendants or the atmosphere of a 'megatrial' alone can establish the compelling prejudice required for reversal based on the denial of a motion to sever.").

*   *   *

The Court **DENIES** Hardaway's motion to sever (Docket No. 399).

### D.   David Kraus

Defendant David Kraus is a former regional sales director for Boston Heart. He moves to sever his trial from that of Susan Hertzberg and the codefendants associated with Stamford. Docket No. 437. Kraus argues (1) he will suffer substantial spillover prejudice from a joint trial with the Defendants associated with Stamford, and (2) he will offer antagonistic defenses to those of his codefendants. *Id.* at 1. Kraus concludes that this prejudice (3) outweighs the interests of judicial economy. *Id.* at 12. These arguments, like those addressed above, likewise fail.

19

**1.**

Kraus argues that severance is appropriate here because he "withdrew from the purported overarching conspiracy" before the Stamford arrangement began. *Id.* at 7–8. He thus contends "the vast majority of the evidence relates to other defendants and is irrelevant" to him, such that he will suffer "spillover prejudice." *Id.* Kraus further argues "his alleged role in the purported conspiracy is minimal." *Id.* at 8.

But even if Kraus is correct that he had no role in the Stamford scheme, he fails to identify "what specific prejudice will transpire." *Chapman*, 851 F.3d at 380; *see also supra* Sections III.A.1, III.B.2, III.C.2. Further, Kraus does not offer, and the Court cannot find, any support for finding as a matter of law that a defendant withdrew from a conspiracy for purposes of a motion to sever. *See United States v. Arata*, 2014 WL 7330618, at *17 (E.D. La. Dec. 18, 2014) ("Arata submits nothing to persuade the Court to decide withdrawal as a matter of law such that it could even reach whether this withdrawal creates a danger of prejudice warranting severance . . . .").

Kraus argues *United States v. Cortinas* requires severance here. 142 F.3d 242 (5th Cir. 1998). But *Cortinas* is distinguishable. There, the Fifth Circuit found severance should have been granted because "highly inflammatory" evidence of a gang-related shooting introduced at trial prejudiced the moving defendants, who were not gang members. *Id.* at 248. Here, in contrast, Kraus identifies no such allegations surrounding the Stamford scheme that would prejudice him. Indeed, the

20

Stamford allegations are nearly identical to those against the non-Stamford defendants, like Kraus. *United States v. McClaren*, 13 F.4th 386, 398 (5th Cir. 2021) (affirming denial of motion to sever where defendants cited *Cortinas* because the court found defendants "were not *wrongfully* associated with people they had no relation to" (emphasis added)).

### 2.

Kraus also argues that Defendants intend to present mutually antagonistic defenses at trial. Specifically, Kraus plans to show that any criminal conduct "was concealed from him by Boston Heart executives, including Hertzberg and Theiler." Docket No. 437 at 11.

Like his codefendants, Kraus fails to identify an antagonistic defense. *See supra* Sections III.A.2, III.B.2, III.C.1.

### 3.

Finally, Kraus argues that prejudice outweighs the interests of judicial economy. Docket No. 437 at 12. Specifically, he argues that the number of codefendants in the forthcoming trial will make it "complex and lengthy." *Id.* This argument fails for the same reasons the Court rejected the identical argument above. *See supra* Sections III.B.4, III.C.3; *see also Posada-Rios*, 158 F.3d at 863.

\*     \*     \*

The Court **DENIES** Kraus's motion to sever (Docket No. 437).

### E.     Matthew Theiler

Matthew Theiler is the former senior vice president of sales at Boston Heart. He asks for a trial against him alone, or alternatively, against him and codefendant Susan Hertzberg.  Docket No. 454 at 1.  Theiler argues (1) he will suffer substantial spillover prejudice from a joint trial with the Defendants associated with Stamford, (2) he will offer antagonistic defenses to those of his codefendants, and (3) the forthcoming "mega trial" will impose substantial burdens on the Court, parties, and jurors.  *Id.* at 2–5.  These arguments are without merit.

### 1.

Theiler first argues that he will suffer spillover prejudice because the evidence against him is minimal when compared to that of his codefendants.  *Id.* at 3. Specifically, he argues the indictment includes allegations of "only his passive receipt of emails[,]" while some of his codefendants allegedly exchanged "bag[s] full of cash" for their participation.  *Id.* at 3.

Theiler's argument ignores many other allegations against him in the indictment.  For example, he allegedly "closely tracked the revenue that [Boston Heart] received from the [Little River] arrangement[,]" Docket No. 1, Count One, ¶ 51, and he met with Stamford representatives to expand the conspiracy to that hospital, *id.* ¶¶ 70–71.  At any rate, Theiler's argument fails for the same reasons the Court rejected it above.  *See supra* Sections III.A.1, III.B.2, III.C.2, III.D.1.  "A spillover effect, by itself, is an insufficient predicate for a motion to sever." *Bieganowski*, 313 F.3d at 287; *see also USPlabs*, 2018 WL 5831478, at *7.

Theiler also argues there is a "particularly acute risk of spillover prejudice" here because the Government may seek to offer his codefendants' testimonial statements. Docket No. 454 at 4. This argument also fails, for the reasons described above. *See supra* Sections III.A.1, III.B.2, III.C.2, III.D.1. The Supreme Court recently reaffirmed the ability of the Government to introduce codefendant testimony in joint trials, so long as certain safeguards are observed. *Samia*, 143 S. Ct. at 2017 (affirming conviction where the district court admitted a redacted version of testimony and issued a limiting instruction to the jury). There is no indication that these safeguards will be ineffective here.

## 2.

Theiler next argues that Defendants intend to present mutually antagonistic defenses at trial. Specifically, he plans to show his codefendants "actively concealed their conduct from him, Ms. Hertzberg, and BHD legal and compliance personnel that Mr. Theiler relied upon." Docket No. 454 at 4–5.

Like his codefendants, Theiler fails to identify an antagonistic defense. *See supra* Sections III.A.2, III.B.2, III.C.1, III.D.2. For the reasons addressed above, Theiler's lack-of-knowledge defense is not antagonistic with the anticipated defenses of his codefendants. *E.g.*, *Bynum*, 566 F.2d at 926; *Macias*, 2009 WL 508719, at *3.

## 3.

Finally, Theiler argues the forthcoming trial will be a "mega trial," which will "exacerbate prejudice" to him. Docket No. 454 at 3. This argument fails for the same

reasons the Court has already provided.  *See supra* Sections III.B.4, III.C.3, III.D.3; *see also Posada-Rios*, 158 F.3d at 863.

*     *     *

Theiler's motion to sever (Docket No. 454) is **DENIED**.

## IV.   CONCLUSION

No defendant has shown that a joint trial will "prejudice him to such an extent that the district court [can]not provide adequate protection . . . ." *Ledezma-Cepeda*, 894 F.3d at 690.  Accordingly, the moving Defendants cannot show that any "prejudice outweigh[s] the government's interest in economy of judicial administration." *Id.*  Thus, the Court **DENIES** the motions to sever.  Docket Nos. 394, 397, 399, 437, 454.  The Court also **DENIES** the related motions for request for oral argument.  Docket Nos. 492, 497.

So **ORDERED** and **SIGNED** this **12th** day of **September, 2023.**

JEREMY D. KERNODLE
UNITED STATES DISTRICT JUDGE

24